**In re Shirley Mary GILLESPIE, Debtor.**

**Bankruptcy No. 89–10042S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 14, 1990.

Geoffrey Walsh, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Dolores L. Keegan, Sp. Asst. U.S. Atty., Office of Regional Counsel, U.S. Dept. of Housing & Urban Development, Virginia

R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for HUD.

David B. Comroe, Philadelphia, Pa., for Lomas Mortgage U.S.A.

Edward Sparkman, Philadelphia, Pa., standing chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant contested matter obliges us to revisit an issue which we previously addressed in *In re Pinder*, 83 B.R. 905, 908–12 (Bankr.E.D.Pa.1988); and *In re Caster*, 77 B.R. 8, 14 (Bankr.E.D.Pa.1987): the scope of 15 U.S.C. § 1612(b), a provision of the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* (hereinafter "TILA"), which exempts political subdivisions from monetary liability under the TILA. We conclude, consistently with *Caster*, that the exemption applies irrespective of whether the particular political subdivision has waived its sovereign immunity generally. We further conclude, consistently with *Pinder*, that political subdivisions are not exempt from compliance with the TILA, only from monetary liability for breaches of compliance therewith. Hence, the exemption cannot itself be assigned by a political subdivision along with a consumer credit contract. This conclusion renders the assignee of contract involving a political subdivision subject to liability.

However, while the factual pattern her is similar to that of *Pinder*, Lomas Mortgage USA, Inc. (hereinafter "Lomas") the assignee of the mortgages in issue from the United States Department of Housing and Urban Development (hereinafter "HUD"), and HUD itself, have herein presented evidence not on the *Pinder* record regarding the terms of a contract between Lomas and HUD, which supports the conclusion that the ultimate liability for the TILA violations will fall upon HUD. However, we follow a line of decisions holding that the fact that HUD will ultimately bear the cost of the TILA violations in issue does not vest Lomas with the § 1612(b) exemption,

since it is an independent contractor rather than a servant of HUD.

Therefore, we conclude that the Debtor, SHIRLEY MARY GILLESPIE (hereinafter "the Debtor"), is entitled to the $2,000 recoupment which she seeks, reducing Lomas' secured proof of claim to $5,298.40.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the instant Chapter 13 bankruptcy case on January 6, 1989. On August 25, 1989, the Debtor filed an Objection to the secured Proof of Claim filed by Lomas in this case (Claim No. 1), on February 17, 1989, in the amount of $11,524.10. The bases of the Objection were the Debtor's alleged right to two separate $1,000 TILA recoupment penalties arising from two separate contracts held by Lomas and the alleged failure of Lomas to properly credit certain payments made to it by the Debtor. After two continuances, during which time the parties engaged in discovery, we ordered that the matter must be tried on November 21, 1989, also the date of a continued confirmation hearing on the Debtor's Plan of Reorganization in her main Chapter 13 case.

On November 21, 1989, the parties presented us with a comprehensive Stipulation of Facts which they agreed would constitute the record, and we ordered that Briefs were to be submitted by December 1, 1989 (Debtor), and December 11, 1989 (Lomas), respectively.

The Stipulation of Facts provided that, on March 22, 1972, the Debtor purchased her home, located at 2333 North Fawn Street, Philadelphia Pennsylvania (hereinafter "the Home"), for a purchase price of $13,000.00, financing it with a note and mortgage insured by the Federal Housing Administration (hereinafter "FHA") of HUD. Subsequently, the mortgage on the Home was foreclosed upon and HUD acquired the Home at a sheriff's sale. However, in accordance with a program established pursuant to a consent decree in a nationwide class action involving FHA-insured mortgages, *Ferrell v. Hills*, No. 73–C–344 (N.D.Ill.), HUD reconveyed the

Home to the Debtor in a transaction consummated on April 29, 1982, for a price established at $17,475.87.

Because this purchase price exceeded the Debtor's 1972 purchase price of $13,000, HUD, pursuant to this program and its policy and practice at the time, took back two notes and accompanying mortgages from the Debtor, the first in the amount of $13,900.00, apparently covering the purchase price plus costs of settlement, and the second in the amount of $3,550.00, covering the excess of the 1982 purchase price over the 1972 purchase price. No payments towards either principal or interest were required on the second mortgage until after the last scheduled payment date on the first mortgage was scheduled to be made on May 1, 2022.

Apparently some time prior to the settlement date of the repurchase, April 29, 1982, HUD provided the Debtor with a document captioned "Statement of Cost of Loan" (hereinafter "the Statement"). The Statement is the only document which Lomas (or HUD) has been able to produce which is even a facsimile of a TILA disclosure statement that was given to the Debtor by HUD in connection with the transaction. *See Pinder, supra,* 83 B.R. at 913 (lender (HUD) has burden of proving compliance with the requirements of the TILA).

What renders the Statement a TILA disclosure facsimile is its use of several TILA terms, *i.e.,* "finance charge," "annual percentage rate," and "total of payments." However, the Statement is in several glaring respects insufficient in supplying the disclosures required by the TILA. Firstly, it is undated. The only date appearing on it is an "estimated date of loan funding" of May 1, 1981, suggesting that the Statement preceded the settlement by at least a year. Secondly, it combines the two mortgage loans together in a "gross loan" of $17,-450.00, which figure is, per the parties' Stipulation of the sale price of the Home, slightly inaccurate. Although reference is made to a "2nd mortgage," the separate terms of neither the first nor the second mortgage are described. The only place on the Statement for the recitation of the annual percentage rate ("APR"), in addition to being inconspicuous, is totally blank. The only disclosure of the security interest taken is a statement that it "includes a first mortgage (and possibly a second mortgage)" on the Home. However, both of the mortgages recite that a security interest is taken not only on the Home itself, but also on "any and all appliances, machinery, furniture and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon" the Home.

The Stipulation further provides that, between April 29, 1982, and April 9, 1986, the Debtor made payments to HUD on the first mortgage, but, as early as 1983, fell behind on same. Consequently, on May 19, 1987, HUD assigned the first and second mortgages to the Lomas' predecessor, the Lomas and Nettleton Co. (hereinafter "L & N"). This assignment of the Debtor's mortgage was transacted pursuant to an Award/Contract between HUD and L & N signed by an officer of L & N on October 26, 1984, and by a federal representative on December 6, 1984 (hereinafter this document is referred to as "the Contract"). The terms of the Contract remained in effect at all times relevant to this proceeding.

On August 2, 1988, L & N filed a state-court mortgage foreclosure action against the Debtor, obtained judgment by default, and scheduled a sheriff's sale of the Home on January 9, 1989. This sale was stayed by the Debtor's bankruptcy filing.

Finally, the Stipulation recited that

[t]he parties have resolved prior disagreements between them as to the calculation of the Debtor's pre-petition arrears with the exception of the applicability of the Debtor's recoupment claim under the Truth-in-Lending Act. It is agreed that (without allowing for any recoupment) the correct figure for pre-petition arrears is $7,298.40. The correct pay off amount (for both mortgages) as of the January 6, 1989 petition date is $24,320.15 ...

... The only issue remaining for adjudication by the court is to what extent, if any, the arrears amount of $7,298.40 and

the pay-off amount of $24,320.15 should be reduced for the Truth-in-Lending recoupment claim raised in the debtor's objection to proof of claim.

Upon receipt of the Briefs, we immediately noted disagreements regarding the content of the Stipulation and the meaning of the Contract. Lomas stated that the claim of $1,714.50 for attorneys' fees and costs should be added to the $7,298.40 arrearages figure despite the wording of the Stipulation, while the Debtor stated that $7,298.40 constituted the entire arrearages figure. The most pertinent dispute over the meaning of the Contract was whether any TILA recoupment penalty would be ultimately borne by Lomas or by HUD. Relevant to this latter point, we noted that, upon appeal of our *Pinder* decision, HUD had participated as an amicus curiae in the district court and had introduced the presence of the Contract to the district court, prompting that court to remand the matter to us to "consider the [C]ontract ... to determine if a penalty assessed against Lomas would be on imposition of a penalty against HUD in violation of 15 U.S.C. § 1612(b)." C.A. No. 88–3528 (E.D.Pa. Sept. 22, 1988).[1] Therefore, we scheduled a conference of counsel in the matter on December 14, 1989, and directed HUD to appear at that conference as well.

The result of that conference was an agreement by Lomas that $7,298.40 *did* constitute its entire maximum allowed secured claim and a directive from this court to Lomas and HUD to move to add HUD as a party in this court and/or to reopen the record made by the Stipulation on or before December 15, 1989, or be bound by the record as it stood. Upon receipt of a "Petition" of Lomas to reopen the record and a Motion of HUD to intervene in this contested matter, we entered an Order of December 18, 1989, allowing the parties to provide us with Supplementary Briefs addressing both these filings and the merits on or before December 29, 1989. Unfortunately, although Lomas and HUD both remitted timely Briefs on all issues, the Debtor mis-

understood our Order, and submitted a Brief on the merits only. We then permitted her to submit a Brief addressing Lomas' and HUD's motions (our sixth separate Brief received in this matter) on January 9, 1990.

On January 17, 1990, we filed an Order and Memorandum granting HUD's Motion to intervene and Lomas' "Petition" to reopen the record. In that Memorandum, we noted that most of the opposition voiced by the Debtor to the Motion and Petition seemed to be directed at HUD's attempt to add an Affidavit of one Stuart E. Malmon, Esquire, to the record as "evidence" of the interpretation of the Contract. We agreed with the Debtor that such a hearsay submission could not be considered as evidence in the record here. *See In re Fleet*, 103 B.R. 578, 590 (E.D.Pa.1989); and *In re Shangri–La Nursing Center, Inc.*, 31 B.R. 367, 370 (Bankr.E.D.N.Y.1983). We therefore stated that, although we could not consider this Affidavit as part of the record, we would schedule a hearing on January 25, 1990, at which Lomas, HUD, or the Debtor would be permitted to submit any additional evidence pertinent to disposition of this matter. We also continued the Debtor's confirmation hearing, hopefully for the last time, until February 27, 1990.

The only witness at the hearing was Mr. Malmon, an attorney who is the Chief of HUD's Claims Management office in Washington, D.C. Mr. Malmon stated that the Contract contemplated service of HUD mortgages from the time of default through foreclosure by Lomas, during which period the mortgage serviced was assigned to Lomas, and that it had been devised to prevent overburdening the United States Attorney's Office with servicing foreclosures of HUD mortgages. He also opined that the ultimate liability for TILA recoupment in the Debtor's situation would be borne by HUD, because it did not appear that Lomas had done anything wrong in servicing the mortgages. Mr. Malmon further stated that no thought had been

---

**1.** The *Pinder* adversary proceeding was ultimately dismissed by this court along with the main case when the Debtor failed to maintain

the payments due under her Plan of Reorganization.

given to the impact of TILA recoupments in bankruptcy when the Contract was drafted and re-drafted when a new contract with another private lender was entered into, effective 1989, because, except for the *Pinder* case, the issue had never arisen in connection with any other of HUD's 70,000 to 80,000 mortgage loans. Finally, Mr. Malmon did not deny the accuracy of an averment, in his Affidavit, that the Contract was executed pursuant to "a decision ... to hire *an independent contractor* to do HUD's foreclosure work" (emphasis added).

At the close of the hearing, we expressed our discovery, through research (and, we might add, to our surprise) that the fact that HUD would ultimately bear the cost of any TILA recoupment permitted was probably not decisive of the issue in favor of Lomas. We nevertheless allowed the parties until February 1, 1990, to submit any further Briefs in light of our statement. All of the parties did file submissions, bringing the total of Briefs received addressing this matter to nine. HUD's Brief featured a discussion of *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), an authority not previously cited by the parties. On February 8, 1990, as we were beginning to draft this Opinion, the Debtor requested permission to submit yet another brief, addressing the *Boyle* case. When Lomas and HUD failed to give an unqualified approval, we declined this offer, considering the matter to be quite sufficiently briefed.

## C. THE ARGUMENTS OF THE PARTIES, AND THIS COURT'S RESPONSES TO THEM

There have been a wide range of arguments raised and briefed by these parties to this matter. We will synthesize each one as they were presented in the Briefs, and briefly recite our response to each of them. Then we will discuss in more detail what we believe is the crucial issue: whether the fact that HUD will ultimately bear the financial burden for the recoupment penalties imposed should render these penalties unavailable to the Debtor pursuant to 15 U.S.C. § 1612(b), which provides as follows:

> (b) No civil or criminal penalty provided under this title for any violation thereof may be imposed upon the United States or any department or agency thereof, or upon any State or political subdivision thereof, or any agency of any State or political subdivision.

■ The Debtor first argues that HUD must comply with the TILA, and that § 1612(b) merely exempts HUD, like any other political subdivision, from monetary liability for TILA violations. This proposition, discussed by us at some length in *Pinder, supra*, 83 B.R. at 908–10, and supported by a subsequent decision in *Federal Deposit Insurance Corp. v. Hughes Development Corp.*, 684 F.Supp. 616, 621–23 (D.Minn.1988), seems unassailable.

■ Secondly, the Debtor points out that the Statement is grossly violative of the disclosure requirements of the TILA. The Debtor devotes most of her attention on this issue to the body of caselaw holding that the TILA is violated by the under-inclusive description of the Debtor's leasehold goods in the Statement. *See* page 745 *supra. See also, Searles v. Clarion Mortgage Co.*, C.A. No. 87–3495, 1987 WL 61932, 1987 U.S.Dist.Lexis 11468 (E.D.Pa. Dec. 9, 1987); *Gambale v. Lomas & Nettleton Co.*, 80 B.R. 308, 309–10 (E.D.Pa.1987); *In re Dangler*, 75 B.R. 931, 934 (Bankr.E.D.Pa.1987); *In re Martin*, 72 B.R. 126, 127–28 (Bankr.E.D.Pa.1987); and *In re Johnson–Allen*, 67 B.R. 968, 971–72 (Bankr.E.D.Pa.1986). This is clearly a viable TILA claim.

■ However, the violations here rise above the merely technical to the complete failure to provide, *inter alia*, the most fundamental of TILA disclosures, *i.e.*, the APR. See 15 U.S.C. § 1638(a)(4). The line for the insertion of the APR, violative of the requirement in the pertinent Regulations, 12 C.F.R. § 226.17(a)(2), that this term, *inter alia*, be "more conspicuous" than other disclosures, is, moreover, blank. The attempt of the Statement to collapse two distinct notes and mortgages into one transaction is also clearly improper. This

results in a failure to accurately disclose the "amount financed," the "finance charge," or the "total payments" in either of the transactions independently and correctly, in violation of 15 U.S.C. §§ 1638(a)(2), (a)(3), (a)(5). Furthermore, the Statement fails to recite the "number, amount, and due dates" of payments or provide the requisite "descriptive explanations" of the key TILA terms, in violation of 15 U.S.C. §§ 1638(a)(6), (a)(8). In sum, almost every disclosure required by the TILA is either omitted from or inaccurately disclosed in the Statement.

■ The Debtor also points out that, since each mortgage secures a note representing a distinct consumer credit transaction, imposition of two TILA recoupment penalties is appropriate, at the maximum of $1,000 apiece, 15 U.S.C. § 1640(a)(2)(A)(i), because the finance charge in connection with each note and mortgage exceeds $500. *See, e.g., Brown v. Marquette Savings & Loan Ass'n*, 686 F.2d 608, 615–16 (7th Cir. 1982); *Aquino v. Public Finance Consumer Discount Co.*, 606 F.Supp. 504, 510–11 (E.D.Pa.1985); and *Dennis v. Handley*, 453 F.Supp. 833, 835–36 (N.D.Ala.1978).

Wisely, neither Lomas nor HUD devote any effort to denying the existence of a TILA violation in the Statement, and Lomas expends only a half-hearted effort to denying the duplicate liability by misplaced reliance upon 15 U.S.C. § 1640(g). *See Aquino, supra*, 606 F.Supp. at 510 (although § 1640(g) limits obligors to one recovery for multiple TILA violations, that subsection does not limit obligors to one recovery if there are violations of the TILA in multiple transactions; the writing of a loan and its subsequent rescission are separate, multiple transactions). We therefore accept it as a "given" that, unless Lomas or HUD can establish the applicability of an exemption under § 1612(b), a $2,000 recoupment from Lomas' proof of claim would be appropriate, reducing Lomas' secured claim to $5,298.40.

■ The Debtor then proceeds to argue that, irrespective of the existence of 15 U.S.C. § 1612(b), HUD itself is not exempt from liability because, in 12 U.S.C. § 1702,

HUD has waived immunity in performing its duties under most subchapters of the National Housing Act, citing, *e.g., Federal Housing Administration v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940); and *Griffin v. Harris*, 480 F.Supp. 1072, 1076 (E.D.Pa.1979). In so arguing, the Debtor is submitting that *Caster*, 77 B.R. at 14, holding that § 1612(b) applies to a HUD-held mortgage, was wrongly decided, and that the reasoning contained in *Pinder* was largely unnecessary.

We cannot agree that this argument of the Debtor is correct. As Lomas points out, 12 U.S.C. § 1702 has not been construed so broadly as to waive HUD's immunity for liability in all aspects of its Housing Act duties. *See United States v. Adams*, 634 F.2d 1261, 1265 (10th Cir.1980); *Thomas v. Pierce*, 662 F.Supp. 519, 525–28 (D.Kan.1987); and *Armor Elevator Co. v. Phoenix Urban Corp.*, 493 F.Supp. 876, 882–84 (D.Mass.1980), *aff'd*, 655 F.2d 19 (1st Cir.1981). The exemption set forth in § 1612(b) is distinct from the principal of governmental immunity, which arises from the deep-seated common law notion of sovereign immunity. *See, e.g., United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980); and *United States v. Thompson*, 98 U.S. 486, 489, 25 L.Ed. 194 (1878). Section 1612(b) applies to any political subdivision, whether that entity has waived immunity generally or not. We therefore cannot agree that *Caster* was wrongly decided or that HUD's immunity from liability under 12 U.S.C. § 1702 is relevant to the issue at hand.

■ Next, the Debtor correctly argues that *Pinder*, 83 B.R. at 910–12, holds that Lomas' status as an assignee from HUD does not in itself empower it to assert the § 1612(b) exemption.

Finally, relying principally on the district court's Opinion in *United States v. Pennsylvania Environmental Hearing Board*, 431 F.Supp. 747 (M.D.Pa.1977), *aff'd*, 584 F.2d 1273 (3d Cir.1978) (hereinafter cited as "*PEHB*"), the Debtor argues that a private independent contractor doing work for the government, as per the Contract in issue, is not empowered to raise the de-

fense of governmental immunity or protections. Thus, this argument, being related to the issue which we ultimately deem is decisive, is discussed further at pages 751–754 *infra.*

In its initial responsive Brief, Lomas devotes attention to successfully rebutting the Debtor's arguments based upon 12 U.S.C. § 1702. Intermingled in that discussion is the assertion that HUD is obliged to bear the effect of any TILA recoupment allowed by the Debtor against HUD. As we indicated at page 746 *supra,* Mr. Malmon of HUD so testified at the trial on January 25, 1990. Despite efforts of the Debtor to argue that the Contract is not totally clear on this point, we now are prepared to find, as a matter of fact, that HUD will ultimately bear the financial impact of any recoupment allowed to the Debtor.

Lomas then argues that *PEHB* is distinguishable from the instant factual matrix because the private party in issue there was an "independent contractor" who was itself responsible for the actions which gave rise to liability, while, here, Lomas was not an "independent contractor" because it was merely an assignee of the note and mortgage transaction in which HUD itself had produced the errant TILA disclosure statement. These arguments, relating to the issue which we ultimately deem is crucial, are discussed at page 752 and 753–754 *infra.*

Lomas next proceeds to reargue the issue decided against it in *Pinder,* 83 B.R. at 910–12, that, when taking an assignment of the Debtor's mortgage and note, Lomas became vested with all of the rights and liabilities of HUD, which of necessity included HUD's exemption under § 1612(b). We believe that the decision in *Hughes Development, supra,* as well as that in *Federal Deposit Insurance Corp. v. Webb,* 464 F.Supp. 520, 525 (E.D.Tenn.1978), supports the conclusion, consistent with that which we reached in *Pinder,* that the exemption from TILA liability articulated in § 1612(b) is personal to political subdivisions and is therefore not itself assignable. In both *Hughes Development* and *Webb,*

the Federal Deposit Insurance Corp. (hereinafter "the FDIC"), in its capacity as liquidator of insolvent national banks, had become the assignee of all rights and liabilities of respective banks. However, despite the holding, in *Hughes Development,* that TILA is applicable to the FDIC, allowing certain rescission rights to be enforced against it, 684 F.Supp. at 622–23, both that case and *Webb* conclude that, by reason of § 1612(b), the FDIC is not liable for civil TILA penalties. Under the law of assignment, according to Lomas, the FDIC, as assignee of the banks' rights, should *not* be immune from such penalties, since they are a part of the "liabilities" which it received in the assignment process. We therefore conclude that Lomas' analysis is incorrect and that § 1612(b) articulates a narrow exemption to TILA liability, which is able to be invoked only by political subdivisions which are holders of consumer credit contracts. *Cf. Werts v. Federal National Mortgage Ass'n,* 48 B.R. 980, 983 (E.D. Pa.1985) (§ 1612(b) may not be invoked by a "government-sponsored private corporation").

Finally, Lomas cites, as support for its argument of non-liability, to that portion of 15 U.S.C. § 1641(a) stating that an assignee is liable under the TILA for a violation on the face of the instrument unless the assignment "was involuntary" and to 15 U.S.C. §§ 1612(c) and (d), which provide as follows:

(c) A creditor participating in a credit program administered, insured, or guaranteed by any department or agency of the United States shall not be held liable for a civil or criminal penalty under this title in any case in which the violation results from the use of an instrument required by any such department or agency.

(d) A creditor participating in a credit program administered, insured, or guaranteed by any department or agency of the United States shall not be held liable for a civil or criminal penalty under the laws of any State (other than laws determined under section 111 to be inconsistent with this title) for any technical or procedural failure, such as a failure to

use a specific form, to make information available at a specific place on an instrument, or to use a specific typeface, as required by State law, which is caused by the use of an instrument required to be used by such department or agency.

From these TILA provisions, Lomas asks us to observe that non-governmental creditors are, in certain circumstances, clothed with the same exemptions as are political subdivisions. The difficulty with this general proposition, if true, is that it is only applicable in the narrow circumstances described in these TILA provisions, and these circumstances are not present here. There is no requirement that Lomas use a particular instrument, which is the set of facts referenced in § 1612(c).[2] There is certainly no indication that the Debtor contends that Lomas is liable for using an instrument in a manner required by state law, as is required to bring § 1612(d) into play. Finally, there is no evidence that Lomas' entry into its contract with HUD or its acceptance of the Debtor's particular mortgage under that Contract was involuntary, which is necessary to render the emphasized clause of § 1641(a) applicable. Certainly, the disclosure violations here were apparent on the face of the instrument, rendering Lomas liable as a voluntary assignee of the note under § 1641(a). Therefore, these Code sections are rather plainly of little pertinence to the matter at issue. Lomas properly gives them very little prominence.

In the second phase of the briefing, submitted at the end of December, the Debtor wisely puts aside the arguments based upon 12 U.S.C. § 1702; argues only secondarily that it is not clear that HUD will bear the financial burden of the recoupment penalty; and focuses upon the argument that, even if HUD is ultimately financially responsible for the recoupment penalties, it cannot pass its exemption on to Lomas. We will discuss this issue, which we believe is determinative of the matter before us, at pages 751–54 *infra*. Lomas focuses upon the significance of the anticipated testimony of Mr. Malmon that HUD will be held ultimately liable for the recoupment penalties.

HUD, in its first submission in the matter, also argues that our receipt of Mr. Malmon's testimony is appropriate, as a means of resolving a contractual ambiguity as to what entity ultimately bears the cost of the recoupment. It also contends that *PEHB, supra,* is not controlling here for two reasons: (1) The Contract did not, as did the contract between the government and the private contractor in issue, in *PEHB,* require HUD to compensate Lomas for Lomas' own negligent acts; and (2) That case dealt with governmental immunity rather than, as here, a statutory exemption. These are curious distinctions. Government immunity would appear to be a concept of deeper historical basis and hence a stronger force than a particular statutory exemption. It would seem more difficult, not easier, to sacrifice the concept of governmental immunity in a situation where the private contractor was negligent, and the government was secondarily liable, than here, where there is no negligence claimed on the part of Lomas and the government will ultimately be liable solely because of its own violation of its own (federal) laws.

In the final phase of briefing on February 1, 1990, the Debtor reiterates her position that the fact that HUD will ultimately bear the cost of the recoupment penalty is immaterial. Lomas attempts to distinguish the cases cited by the Debtor on two bases: (1) The Contract does not expressly state that Lomas was an independent contractor; and (2) The TILA violations were not committed by Lomas, but by HUD. Section 1612(c) is again invoked. Finally, Lomas reiterates its prior arguments based on the law of assignments and 15 U.S.C. § 1641(a).

HUD introduces a new line of cases into the controversy. It cites to that body of cases which hold that contractual obligations incurred by HUD involve a uniquely federal interest and therefore must be controlled by federal law. Cited are *Boyle, supra; Priebe & Sons, Inc v. United*

---

**2.** *See also* page 753 *infra.*

*States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); and *Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). *See also United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

At this point, the briefing was finally completed. We believe that the disposition of the matter turns upon the principle that HUD's ultimate fiscal responsibility for the recoupment penalty is not a shield from liability. The issue of HUD's ultimate responsibility, we note, was apparently the only concern of the district court in remanding the *Pinder* case to allow us to determine whether the fact that the recoupment is ultimately "the imposition of a penalty against HUD." To our surprise, we find clear authority that HUD's ultimate responsibility for the penalty is irrelevant, and hence that the Debtor must prevail.

D. CONTROLLING SUPREME COURT PRECEDENT ESTABLISHES THAT THE GOVERNMENT'S ULTIMATE RESPONSIBILITY FOR LIABILITIES IMPOSED UPON ITS INDEPENDENT CONTRACTORS IS IRRELEVANT IN DETERMINING WHETHER SUCH LIABILITIES ARE BARRED BY A GOVERNMENTAL IMMUNITY OR EXEMPTION

We can well understand the feeling of Lomas and HUD that the fact that the TILA recoupment liability will fall upon HUD should render § 1612(b) applicable to render HUD exempt or immune from liability here. In the early stages of this matter, we shared that feeling. However, an unbroken line of cases, the most memorable of which is *Powell v. United States Cartridge Co.,* 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950), hold squarely to the contrary. *Powell* involved an attempt to impose liability on a private contractor operating a government-owned munitions plant for violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (hereinafter "FLSA"). *Id.* at 498, 70 S.Ct. at 756. The contract under which the plant was

operated provided that the government would reimburse the contractor for its expenditures in these operations, *id.,* at 499–500, 70 S.Ct. at 757–58, including, obviously, the payment of wages to the contractor's employees in accordance with the FLSA, if it applied. In response to the argument, echoed by Lomas and HUD here, that the government could have avoided the strictures of the FLSA by simply having its own employees perform the contract, the court responds that the government *could* have done so but, not having in fact *done* so, is not protected from liability. *Id.* at 504–06, 70 S.Ct. at 759–60. The Court states that, by instead choosing private industry to do its work, thereby promoting the free enterprise system, the government was required to accept the consequences of its choice. *Id.* at 505–07, 70 S.Ct. at 759–60.

The *Powell* case was subsequently followed in *United States v. Boyd,* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964); and *United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958). In both of these cases, the Court held that government contractors were liable for state-imposed taxes, even though such taxes were ultimately passed on to the government.

Three more recent decisions of federal Courts of Appeal have followed *Powell.* The most notable is the *PEHB* case, decided by the Third Circuit on appeal, since this decision is controlling upon us. In that case, a Pennsylvania state agency sought to compel a private company operating an Army munitions plant to comply with a federal anti-water pollution law. 584 F.2d at 1274–75. The contract between the government and the private company in issue in *PEHB* unambiguously, unlike the instant Contract, stated that the government was obliged to hold the contractor harmless for all costs and damages and to indemnify it therefor. *Id.* at 1275. Therefore, the penalties levelled upon the company operating the plant would ultimately fall upon the government. Finding the private company to be an independent contractor, and taking note of *Powell's* statements

that the government itself eliminated any exemption or immunity by opting for the " 'genius' of private enterprise" in the operation of the plant, *id.* at 1279, the court affirmed the distinct court's decision holding the private company liable for a civil penalty for violating the federal law in issue. Although Judge Hunter dissented, we note that the majority's decision was consistent with unanimous decisions in *Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867, 873–75 (8th Cir.1974); and *Whitaker v. Harvell–Kilgore Corp.*, 418 F.2d 1010, 1014–15 (5th Cir.1969).

■ We believe that our initial impression that the fact that the government ultimately would bear the fiscal burden of the recoupment penalty was significant was culled from cases where the party against whom monetary relief was sought was a governmental employee. In such cases, courts must clearly look to whether their orders providing relief are in fact directed at the government's treasury. *See, e.g., Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Hagemeier v. Block*, 806 F.2d 197, 202 (8th Cir.1986); and *Rhodes v. United States*, 760 F.2d 1180, 1184 (11th Cir.1985). In the area of suits against governmental employees we note, as does the court in *Thomas v. Pierce, supra*, 662 F.Supp. at 527–28, slippage in the disfavor of the doctrine of governmental immunity by the Supreme Court.[3]

■ However, this trend has not, as far as we can determine, spilled over into the realm of actions brought against entities who are independent government contractors. Perhaps recognizing this dichotomy, Lomas and HUD have repeatedly attempted to distinguish the *Powell* line of cases by contending that Lomas is not properly characterized as an independent contractor in the Contract. There are two problems with the position of Lomas and HUD that Lomas is not to be considered as an independent contractor in the Contract.

Firstly, this is the characterization which Mr. Malmon, their own sole witness on the interpretation of the Contract, chose, in his Affidavit, to utilize. Secondly, there is no logical alternative characterization of Lomas' role suggested. We ·note that RESTATEMENT (SECOND) OF AGENCY, § 2 & Comment *b*, at 12–14 (1958), suggests that there are only two types of agency relationships, *i.e.*, those of master and servant and those of principal and independent contractor. Clearly, as Mr. Malmon's testimony as well as Lomas' autonomous behavior in this court in this and the *Pinder* matter illustrates, HUD did not control the physical conduct of Lomas in the performance of its duties under the Contract. *Id.*, §§ 2(1), 2(12), & comment *a*, at 12–13. Therefore, Lomas could not be considered to be the "servant" of HUD, like a HUD employee. Hence, its status must be, as Mr. Malmon stated, that of an independent contractor of its principal HUD.

The master-servant, principal-independent contractor dichotomy is well illustrated in *Vest v. Waring*, 565 F.Supp. 674 (N.D.Ga.1983). In that case, which challenged monopolistic practices in eye surgery, the court held that employees of the National Advisory Eye Council were immune from suit, *id.*, at 683–85, but that private parties engaging in research for the National Eye Institute were not immune from suit. *Id.* at 685–89. In so holding, the court drew a distinction between parties which· are a "arm" of the government as opposed to those who serve as a mere "instrumentality" of the government. At its core, this distinction is very similar to the master-servant and principal-independent contractor dichotomy.

Similarly, we find that governmental immunity extends only to *servants* of the government. It does not extend to *independent contractors* of the government, like Lomas, which take assignments from the government as an aspect of their undertaking.

---

**3.** It appears that, somewhat ironically, the presently constituted "conservative" Supreme Court is more likely than its predecessors to render

"big government" immune from suit brought against it by private individuals and other entities.

We therefore clearly reject the attempts to distinguish such cases and *Powell* and *PEHB* because the private parties there were unmistakably independent contractors, while the relationship of Lomas to HUD is posited to be a different, closer relationship. There is no "closer" relationship except the clearly inapplicable master-servant relationship. Therefore, we conclude, as a matter of law, that Lomas is an independent contractor of HUD under the Contract.

HUD's reference to the *Boyle* case and the other "federal interest" cases is somewhat ingenious, but ultimately most be viewed as missing the mark. The "federal interest" cases merely present a choice of law (state law or federal law?) issue. No such choice must be made here, because the TILA is a federal statute, as is the Bankruptcy Code under which this case arises. There is no contention that any state law applies or of any conflicts with any state laws that must be encountered in deciding this matter under the Debtor's theories.

*Boyle* is an extension of the "federal interest" line of cases, not a pronouncement extending governmental immunity generally. Private government contractors (if you will, independent contractors) are therein declared within the scope of the protections of federal law, specifically the Federal Tort Claims Act, 28 U.S.C. § 2860(a), rather than held subject to all aspects of state tort law. 108 S.Ct. at 2513–18. Again, there is no issue of choice of law here; clearly the TILA applies, and § 1612(b) would apply as a shield from the monetary liability for the government if it had chosen to retain the Debtor's mortgages. Instead, it chose the "genius of private industry" to administer foreclosure of its mortgages, presumably in order to further free enterprise. It must suffer the consequences of this choice.

The *Boyle* factual situation is of course quite distinct in numerous respects from the case at bar, to such a degree that its pertinence to the matter at bar is at best oblique. It is true that, in language emphasized by HUD in its Brief, the Court

suggests, in *Boyle*, 108 S.Ct. at 2515, that the fact that the government would ultimately bear the brunt of a contrary ruling by being possibly induced to build equipment itself instead of assigning that task to private industry represents a social policy in favor of its decision. However, the scenario presented there—the scope of liability of a private corporation manufacturing helicopters pursuant to government specifications, *id.* at 2513—is more closely analogous to the scenario described in 15 U.S.C. § 1612(c) of a contractor preparing forms pursuant to governmental requirements than the scenario described in 15 U.S.C. § 1612(b), *i.e.*, that the government is exempt from monetary liability because it is a political subdivision holding a document containing a TILA violation, irrespective of who created it. As we previously stated, we find that the facts here are not within the scope of § 1612(c). HUD produced the form; it was not produced by Lomas, pursuant to HUD's direction, as in the scenario envisioned by § 1612(c). There is no indication in *Boyle* that the Court meant to retract the holding of the *Powell* line of cases or apply its "social policy" argument to overrule or even weaken them. Neither *Powell* nor any of the other decisions in that line of cases are cited by either the majority or the dissent in *Boyle*. We therefore consider ourselves bound by *Powell* and its progeny to rule against Lomas and HUD in this matter.

We finally ponder some other distinctions Lomas and HUD suggested exist between the *Powell* line of cases and the instant case. There certainly cannot be a distinction based upon the governmental monopoly or interest in the duties performed. It is difficult to conceive of an area of greater governmental interest and monopolistic control than production of weapons in support of our country's defense which was in issue in *Powell* and *PEHB*. Certainly assisting low-income homeowners is much less of a governmental monopoly, and possibly it is of much less interest to the government than warfare.

It is true that, here, HUD produced the errant form itself. In the *Powell* line of

cases, the private contractors took the actions which violated the applicable federal laws. However, it seems, if anything, less fair to saddle the government with the shortcomings of private contractors than its own shortcomings. It is hard to invoke sympathy or social policy considerations which favor the government's giving low-income consumers disclosure statements which are veritable minefields of TILA violations with complete impunity.

Finally, HUD suggested, in a colloquy at the close of the hearing on January 25, 1990, that this court's articulated analysis appeared to improperly focus on the narrow issue that HUD had made an assignment of the mortgages to Lomas, and that the results could easily be altered if the Contract were administered differently, or if the Debtor's particular mortgages were suddenly transferred back to HUD. The observation that HUD has the power to prevent the Debtor from making a recoupment claim by servicing its mortgages differently certainly appears to be true. However, this fact merely illustrates the control which HUD has to manipulate the status of its mortgages and insulate itself from liability. That it chose to invoke the "genius of private industry" or this particular procedural apparatus for putting that genius to work for it, was and is strictly within HUD's control. Our focus on this issue was therefore not improper. It would probably be imprecise to characterize HUD's voluntary exposure to liability from which it would otherwise be exempt as a waiver of any exemption or liability. However, we would feel much more uncomfortable about our result if HUD lacked the almost complete control which it has over that exposure.

E. CONCLUSION

At some point in this Opinion, we considered and rejected each of the defenses articulated by Lomas and HUD to the reduction of Lomas' proof of claim to $5,298.40, pursuant to the Debtor's objections thereto. Accordingly, we will enter

an Order sustaining those objections to that extent.