In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1934

Geraldine L. Rendler,

Plaintiff-Appellant,

v.

Corus Bank, N.A., formerly
known as Aetna Bank, N.A.,
formerly known as Belmont
National Bank of Chicago,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 7351--Nan R. Nolan, Magistrate Judge.

Argued September 26, 2001--Decided December 3, 2001

Before Flaum, Chief Judge, and Coffey and
Manion, Circuit Judges.

Manion, Circuit Judge.  In 1995,
Geraldine Rendler applied to Corus Bank
to finance the purchase of a condominium
and received both an adjustable rate note
secured by a first mortgage and a home
equity line of credit secured by a second
mortgage under Corus Bank's 80/20 loan
program. Rendler subsequently sued Corus
Bank under the Truth in Lending Act
("TILA"), alleging that the bank violated
the Act by issuing two loans and two TILA
disclosure statements in connection with
a single credit transaction. The district
court certified a class of individuals to
whom Corus Bank issued two loans and two
TILA disclosure statements in connection
with the financing of a single purchase
or the refinancing of a single piece of
residential real estate. Following
discovery, the district court granted
Corus Bank summary judgment holding that
it had not violated the TILA. Rendler
appeals this decision and we affirm.

I.  Background

On October 5, 1995, Geraldine Rendler
entered into a contract with Corus Bank
to finance a purchase of a condominium

unit./1 Under the financing agreement, Corus lent Rendler a total of $53,200 through two separate loans pursuant to its 80/20 loan program. Under the 80/20 program, customers, like Rendler, who sought to finance more than eighty percent of the purchase of residential real estate were offered two loans. The first loan was a closed-end transaction in the form of a fully amortizing note for eighty percent of the property's value, and the second loan was a home equity line of credit. The home equity line of credit was a seven-year open-end loan for the remainder of the purchase price, meaning that the consumer could pay off the balance of the loan or borrow additional sums. Each loan was secured by a separate mortgage against the property, and both loans were offered as either stand-alone products or together./2 Under the program, investors could finance the purchase of property without a down payment and avoid paying private mortgage insurance typically required for borrowers financing more than eighty percent of a home purchase./3 Corus regularly offered loans to residential property consumers under the 80/20 program. At the time Rendler applied for financing to purchase her condominium, Corus did not offer a fully amortizing first mortgage loan for an amount in excess of eighty percent of the value of the property to be purchased.

Rendler's primary loan transaction with Corus Bank was an adjustable rate note secured by a first mortgage on the property with a principal amount of $44,200 at an annual percentage rate of 8.61%. In addition, Rendler entered into a home equity line of credit secured by a second mortgage on the property, with a term of seven years, a maximum credit amount of $8,400 and an adjustable annual percentage rate of 4.5% above prime rate. At the closing on November 20, 1995, Rendler borrowed the full amount on her home equity line of credit and applied it towards the purchase of her condominium. Corus provided Rendler with separate TILA disclosure statements for each loan, both of which were signed by Rendler on November 20, 1995. The disclosure statement for the closed-end loan was a one-page document that clearly denoted the percentage rate, finance charge, amount financed and total of payments as required by the TILA. The home equity

line of credit agreement disclosure statement was more detailed and included the percentage rate, balance and fee information required by the TILA. Rendler admits that both disclosures, if considered individually, are adequate under the TILA.

Almost one year later, on November 8, 1996, Rendler sued Corus claiming that Corus violated the TILA by not providing her with one disclosure statement for the combined loan. Rendler alleged that by offering two simultaneous loans and two sets of TILA disclosure statements, Corus violated the TILA's requirements that disclosures be grouped together to allow easy comparison amongst different lenders.

In her complaint, Rendler sought to certify a class of consumers who had received financing from Corus under simi lar circumstances. After four years of litigation the district court certified a class of individuals who obtained a loan from Corus on or after November 5, 1998, where: (1) Corus files show that the credit was applied for the purchase or refinancing of residential property, and (2) Corus issued two loans and two TILA disclosure statements in connection with the financing of a single piece of residential real estate. Geraldine Rendler was named as the class representative./4 Once the class was certified, both Corus Bank and Rendler moved for summary judgment on Rendler's claim that Corus violated the TILA by providing two loans and two Truth in Lending disclosures in connection with the financing or refinancing of a single piece of real estate./5 The district court granted Corus Bank's motion and denied Rendler's cross-motion for summary judgment, holding that nothing in the Truth in Lending Act would prohibit a lender from simultaneously entering into two loans and issuing two separate TILA disclosures for each transaction. The court also found that Rendler's class of plaintiffs could not maintain a cause of action involving loan splitting because in this case the class was not defined to be limited to individuals who expected to enter into more than one transaction. Rendler appeals.

II.  Discussion

On appeal, Rendler argues that the district court erred in granting Corus Bank summary judgment and denying her motion for summary judgment because the undisputed facts demonstrate that Corus violated the TILA. Specifically Rendler contends that Corus' disclosures in the 80/20 program violate the TILA because Corus does not provide a single piece of paper summarizing the combined annual percentage rate that consumers will have to pay on the combined loans. In addition, Rendler claims that Corus violated the TILA by mischaracterizing a single credit transaction, namely the financing of a single piece of real estate, as two separate transactions. We review a district court's summary judgment decision de novo. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); Grun v. Pnumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1999); Curran v. Ho Sung Kwon, 153 F.3d 481, 485 (7th Cir. 1998).

A.   The Disclosure Statement Claim

Corus makes no attempt to shade the purpose of its 80/20 program, which allows customers to finance more than eighty percent of the purchase price (or value) of their home through two loans. It adopted the program "in response to customer complaints about the cost of private mortgage insurance which was required for mortgage loans of more than eighty percent of the property's value." The alternative of a home equity line of credit for the balance of up to the remaining twenty percent of the property's value apparently offered a less expensive substitute for the private mortgage insurance.

Rendler first argues that by failing to provide a single disclosure statement summarizing the combined annual percentage rate on both loans, Corus Bank violated the TILA's disclosure requirements. The TILA is a disclosure statute. It does not substantively regulate consumer credit but rather "requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction." Valencia v. Anderson Bros. Ford, 617 F.2d 1278, 1282 (7th Cir. 1980), rev'd on other grounds, 452 U.S. 205 (1981). The

disclosures vary depending on the type of loan transaction.

The TILA recognizes two general types of consumer credit transactions: open-end credit and closed-end credit. See Benion v. Bank One, Dayton N.A., 144 F.3d 1056, 1057 (7th Cir. 1998). The disclosure requirements for each type of transaction are described in different sections of the TILA's implementing regulation, Regulation Z. See 12 C.F.R. sec. 226.17–18 (closed-end credit disclosures); 12 C.F.R. sec. 226.5b (open-end credit disclosure). For closed-end credit disclosures, the TILA requires that a creditor make the required disclosures "clearly and conspicuously in writing. . . ." 12 C.F.R. sec. 226.17(a)(1). In addition, "[t]he disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under sec. 226.18." Id. For open-end credit disclosures, the TILA requires that the disclosures required shall be "made clearly and conspicuously and shall be grouped together and shall be segregated from all unrelated information." 12 C.F.R. sec. 226.5b(a)(1). Rendler admits that each disclosure statement provided by Corus Bank satisfied the respectiverequirements, but contends that the disclosures were deceptive in that they hid the true cost of the loans she received and prevented her from comparing her loan to loans offered by other institutions.

The TILA's goal is to help consumers accurately compare credit rates. As the statute recites, "[i]t is the purpose of [the TILA] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against unfair credit billing and credit card practices." 15 U.S.C. sec. 1601(a); Williams v. Chartwell Fin. Servs., 204 F.3d 748, 757 (7th Cir. 2000). Needless to say, all TILA disclosures must be accurate. Gibson v. Bob Watson Chevrolet-Geo, Inc., 112 F.3d 283, 285 (7th Cir. 1997).

In her quest for more accuracy, Rendler requests this court to interpret the TILA

as requiring a lender to provide a single document to a borrower, that reflects the total cost of a loan, regardless of the number or variety of loans that comprise a credit transaction. The heart of Rendler's argument is that even though two distinct loans were issued, with two distinct and adequate disclosure statements, the subject matter of both loans was financing a single piece of real estate and therefore should be viewed as one transaction requiring one statement. See In re Buckles, 189 B.R. 752, 760 (Bankr. D. Minn. 1995) (stating that the giving "of two separate disclosure statements for a single loan transaction is a violation of the TILA's requirement of a single, comprehensible disclosure of the cost of credit").

We disagree. The TILA anticipates situations where two parties will conduct multiple transactions necessitating multiple disclosures to achieve one goal. Under 12 C.F.R. sec. 226.17(c)(6)(i), which applies to closed-end transactions, "[a] series of advances under an agreement to extend credit up to a certain amount may be considered as one transaction." (emphasis added). This section, in addition to the official commentary/6 that accompanies the statute, makes it clear that the regulation encompasses situations where multiple credit transactions with multiple disclosures would be used to finance a single piece of property. The official commentary to Regulation Z has been regarded as an "authoritative interpretation" of the TILA and Regulation Z by this court. In re Dingledine, 916 F.2d 408, 411 (7th Cir. 1990). The commentary also states that "creditors have flexibility in handling credit extensions that may be viewed as multiple transactions." 12 C.F.R. sec. 226, Supp. 1, 17(c)(1)- (16). As an example, the commentary notes that "[t]he separate financing of a down payment in a credit sale transaction may, but need not, be disclosed as two transactions (a credit sale and a separate transaction for the financing of the down payment)." Id. In Rendler's case, the home equity line of credit substitutes for the traditional down payment and therefore qualifies as a separate transaction. Despite the fact that both credit transactions involved a single piece of residential property, there were two

distinct financial transactions--a first and a second mortgage./7 The commentary makes it clear that lenders have some flexibility in structuring loan transactions with each consumer, even multiple loan transactions financing a single piece of property. This is particularly true when these transactions are different types of loans. The disclosure requirements for open-end credit transactions and closed-end credit transactions are segregated into different sections of the regulations. The fact that each type of credit transaction has its own set of required disclosures indicates that the regulations are designed to control the credit transactions themselves and not the underlying property for which the credit is obtained. Because each of the loans that Rendler applied for was a separate transaction, Corus had the discretion under the Act to issue two disclosure statements.

Also, the facts of this case would not only make the task of providing a single disclosure statement very difficult, but it could even defeat the TILA's purpose of keeping the comparison of rates simple. Williams, 204 F.3d at 757. The home equity line of credit that Ms. Rendler received in addition to her mortgage was a revolving line of credit with an adjustable rate. A single disclosure statement reflecting an annual percentage rate for both of her loans would have to be altered on a monthly basis to reflect any excess payments or amounts reborrowed on her line of credit. In fact, almost one quarter of the class members who received loans under the 80/20 program paid down and then reborrowed on the home equity line of credit, thereby completely altering their loan package midway through the term of the loan./8 If Corus had issued a single piece of paper reflecting a combined annual percentage rate for those individuals, it would have been completely meaningless once the home equity line of credit was paid off.

Ms. Rendler is correct in her assertion that a purpose of the TILA is to allow consumers to compare credit terms offered by various lending institutions. Id. Given these circumstances and based upon the disclosures presented, it would have been difficult for a consumer like Ms.

Rendler to compare her 80/20 loan package to a single loan for the full value of her property that included private mortgage insurance from another lender. However, the purpose of the TILA is for consumers to be able to compare similar credit transactions./9 It does not require that all credit transactions be similar. Ms. Rendler could have easily compared her primary mortgage loan for eighty percent of the property value with other lending institutions' similar offerings. She also could have shopped around her second mortgage for a comparable rate. And finally, she could have had another institution compare both loans together to a full value mortgage that included mortgage insurance. Rendler admits that when taken individually, the disclosures for her two loans satisfied TILA requirements and therefore could easily have been used for comparison purposes by other lending institutions.

The ultimate adequacy of the clarity of TILA disclosures can only be judged by an objective reasonable person standard. See Smith v. Check-N-Go of Ill., Inc., 200 F.3d 511, 515 (7th Cir. 1999). The standard is met in this case. Rendler requested and received financing for her home. She received eighty percent through a fully disclosed closed-end loan and the balance through a properly disclosed open-end line of credit. Issuing two disclosures for two different mortgages is an acceptable method under the TILA for Corus to clearly communicate the details of the transaction to a borrower without unnecessary confusion.

B.  Loan Splitting

Rendler also argues that the district court erred in granting Corus Bank's summary judgment motion and denying her motion based on her claim that Corus violated the TILA by splitting Rendler's loan into two separate transactions. She claims that Corus engaged in "loan splitting" when it issued her two loans, on its own volition, when she only filled out one application and sought only one loan. Loan splitting may be defined "as the situation where the debtor wanted, requested and expected to receive a single loan, consummated in one transaction, but the lender documented and made disclosure for the loan as if it were two separate transactions." In re

Buckles, 189 B.R. 752, 760 (D. Minn. 1995). Several district courts have held that loan splitting violates the TILA because the Act mandates that the lender provide a single, comprehensible disclosure of the cost of credit./10 We need not decide however, whether loan splitting, as defined in In re Buckles, violates the TILA because that is not what is claimed by the Rendler class. In this case, the class is defined as those individuals to whom "Corus issued two loans and two TILA disclosure statements in connection with the financing of a single piece of residential real estate." The class is not limited by the expectations of the consumers. In fact, three-fourths of potential class members under this definition submitted two applications for and expected to receive two separate loans from Corus Bank. Loan splitting focuses on whether the borrower expected to enter into more than one transaction. See Buckles, 189 B.R. at 760. The key for a loan splitting claim is the breach of the borrower's expectations by the lender, and because this class definition does not include a limitation based on those expectations, the Rendler class cannot maintain a claim for loan splitting.

III.  Conclusion

   For the reasons stated above, we AFFIRM the district court's grant of summary judgment. Corus Bank's 80/20 program did not violate the Truth in Lending Act's disclosure requirements because the disclosures provided were adequate and there is no per se requirement in the Act that disclosures for multiple transactions be combined into one statement. Additionally, the TILA does not prevent a lender from issuing two loans to a consumer to finance a single piece of property when the expectations of the consumer are not frustrated.

FOOTNOTES

/1 The original loan transactions in 1995 were made between Geraldine Rendler and Aetna Bank, N.A. Aetna Bank, N.A. and Belmont National Bank of Chicago are both predecessor entities of Corus Bank, N.A. and the original complaint in this action was filed against Corus Bank in November 1996. For convenience, we will refer to the entity as Corus throughout the opinion.

/2 Seventy-four percent of borrowers under the 80/20 program with Corus Bank signed and submitted two loan applications, one for the mortgage loan and a second for the home equity line of credit. In this case, Geraldine Rendler submitted only one application for the entire financing of her condominium.

/3 The Charter Acts of the Federal National Mortgage Association and the Federal Home Loan Mortgage Association normally require residential real estate consumers to buy mortgage insurance if the loan amount exceeds eighty percent of the appraised value. See 65 F.R. 12632, 12717 n. 208 (March 9, 2000).

/4 Corus Bank did not appeal the certification of the class and that issue was not raised in its subsequent summary judgment motion.

/5 In her complaint, Rendler also alleged that Corus Bank violated the TILA by offering consumers a home equity line of credit and open-end credit disclosures in connection with a condominium purchase financed by a closed-end loan. That count was dismissed and Rendler does not appeal that decision.

/6 Under the official commentary provided with the regulation, if there is a series of advances involved in a transaction:

1. Series of advances. Section 226.17(c)(6)(i) deals with a series of advances under an agreement to extend credit up to a certain amount. A creditor may treat all of the advances as a single transaction or disclose each advance as a separate transaction. If these advances are treated as 1 transaction and the timing and amounts of advances are unknown, creditors must make disclosures based on estimates, as provided in sec. 226.17(c)(2). If the advances are disclosed separately, disclosures must be provided before each advance occurs, with the disclosures for the first advance provided by consummation.

12 C.F.R. sec. 226, Supp. I, Par. 17(c)(6) (2001).

/7 Corus argues that the regulations regarding open-end and closed-end transactions, when read in concert, indicate that the TILA not only permits multiple disclosure statements but prohibits the combining of the disclosures for these transactions into a single disclosure. Corus cites In re Gillespie, 110 B.R. 742 (E.D. Pa. 1990), as holding that multiple disclosures for multiple loans may not be consolidated into one disclosure. The facts in Gillespie are different from the case at hand in that the two mortgages in

question in Gillespie were issued almost a decade apart. Id. at 744. In addition, in Gillespie, when the lender collapsed the two notes into one disclosure, the lender failed to include other information required by the TILA such as "amount financed" and "total payments." See id. That is not the case here. Corus issued both of the disclosures to Rendler on the same day, and included all required information. We do not need to reach the question of whether the TILA prohibits issuing one disclosure statement for a real estate financing package that involves both open-end and closed-end loan transactions in order to rule in this case.

/8 The fact that almost a quarter of the potential class members reborrowed on their home equity line of credit also nullifies Rendler's reliance on this court's statements in Benion v. Bank One Dayton, N.A., 144 F.3d 1056 (7th Cir. 1998). In that case this court noted in dicta that a company that only sells aluminum siding could not offer open-end credit to a consumer to finance the siding because it would be unlikely for the company to expect repeat transactions on the credit line. See id. at 1060. Rendler argues that if open-end credit is improper for aluminum siding for a house, then it cannot be proper for financing the house itself. In this case, not only should the bank have expected repeat transactions on the home equity line of credit applied to the down payment, but there actually were multiple transactions by some of Corus' customers.

/9 See Brown v. Marquee S.&L. Ass'n, 686 F.2d 608, 612 (7th Cir. 1982) (stating the TILA purpose is to "provide information to facilitate comparative credit shopping and thereby the informed use of credit by consumers.").

/10 See Harris v. Illinois Vehicle Premium Finance Co., 2000 WL 1307513, at *2 (N.D.Ill. Sept. 12, 2000) (describing loan splitting as violative of the TILA due to the need for a single comprehensive disclosure for a single loan transaction); see also, Hemauer v. ITT Financial Services, 751 F.Supp. 1241 (W.D.Ky. 1990) (holding that a lender violated the TILA by splitting the charges surrounding one loan into two loans executed on the same day where the consumer only sought one loan).