Harry **BENION** and Patricia Benion, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BANK ONE, DAYTON, N.A.,** Echo Acceptance Corporation, and Superior Satellite, Defendants.

No. 95 C 4178.

United States District Court, N.D. Illinois, Eastern Division.

June 11, 1997.

Daniel A. Edelman, James O. Latturner, Cathleen Combs Cohen, Tara Leigh Goodwin, Michelle Ann Weinberg, Danielle Renee Gomez, Rick D. Young, Edelman & Combs, Chicago, IL, O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, James Eric Vander Arend, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Harry Benion, Patricia Benion.

Norman Benjamin Berger, Jonathan N. Ledsky, Craig Allen Varga, Rachel A. Hart, Varga, Berger, Ledsky & Hayes, Chicago, IL, for Bank One, Dayton, N.A., Echo Acceptance Corp.

Ira E. Rubin, David H. Pauker, Pauker & Rubin, Chicago, IL, for Superior Satellite, Inc.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs Harry and Patricia Benion have brought this class action suit against Bank One, Dayton, N.A., Echo Acceptance Corporation, and Superior Satellite, Inc., alleging violations of the Truth In Lending Act ("TILA") in Count I, and the Illinois Consumer Fraud Act ("ICFA") in Count II. Bank One and Echo have moved for summary judgment pursuant to Fed.R.Civ.P. 56. Superior has filed a piggyback motion for summary judgment, arguing that if summary judgment is granted in favor of Bank One and Echo, it cannot be liable either. Finally, the plaintiffs have cross-moved for summary judgment, seeking a ruling that the defendants are liable to them as a matter of law. This opinion addresses all of the parties' motions for summary judgment.

For the reasons described below, this court reluctantly finds that the defendants are, on the undisputed facts of this case, entitled to summary judgment. Our conclusion is reluctant because consumers' use of the charge card credit plan at issue here undeniably tends to undermine their ability to appreciate fully the cost of their credit obligations, to the detriment of Congress' goal in enacting TILA—enabling consumers to shop for and use credit wisely. *See* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit"); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559, 100 S.Ct. 790, 793–94, 63 L.Ed.2d 22 (1980) (same). A thoughtful consideration of the issues presented in this case suggests that the present test for compliance with TILA does not cope well with advances in the marketing of big-ticket consumer products by creditors and retailers. However, fine-tuning the scope of TILA is a legislative rather than a judicial function. Further legislative or administrative treatment of these issues is sorely needed. In the absence of better guidance in this area, we apply the law as it is written and find that the undisputed facts of this case entitle the defendants to judgment in their favor as a matter of law.

### RELEVANT FACTS [1]

In February 1995, the Benions visited a Sam's Club store in which a salesman for

---

1. The following recitation of facts is drawn from the parties' various submissions of undisputed

Superior Satellite, a local consumer electronics retailer, was demonstrating and selling satellite television systems. Patricia Benion—like many Chicagoans, an avid sports fan—was entranced by the astounding number of sports games available with a satellite television system. On the spot, the Benions agreed to purchase a satellite television system for $4,297.52. In addition to a satellite dish, roof mount, and various free accessories, the sale included one year's worth of programming (the most expensive programming package available, so that Patricia Benion could be sure to get all her games) which cost $996.00 by itself. When Patricia Benion expressed doubt that her credit rating was good enough to enable her to make this purchase, the salesman suggested that she apply for an EchoStar Revolving Charge Plan. The Benions signed the application for the charge plan without reading it. The parties disagree about what information the Benions were given about the charge plan before they signed the application. A charge account was opened for the Benions with a credit limit of $4,500.00, a few hundred dollars above the amount of their first purchases. There is no evidence of whether it is typical that the credit limits on EchoStar accounts are set just above the amount of the first purchases.

The application completed by the Benions was for the EchoStar Revolving Charge Plan ("Plan"), a private label credit card offered by Bank One, a national bank with its principal place of business in Dayton, Ohio. Bank One began issuing this credit card in 1994 through an agreement with Echo Acceptance Corporation, a consumer finance company specializing in arranging credit for the sales of equipment and programming related to satellite television systems. Once an account under the Plan is opened for a consumer, the consumer is issued a plastic credit card that may be used to make purchases at any Echo authorized dealer, of which there are several hundred throughout the country, or to order products or television programming directly from Echo or programming packagers. Authorized dealers sell satellite dishes, receivers, accessories, and programming distributed by EchoStar Communications Corporation, and also typically stock other consumer electronics products including televisions, VCRs, and stereo equipment. Superior Satellite is one such authorized dealer. According to instructions issued to Echo dealers, a satellite receiver must be included in the first purchase a consumer makes using the new credit card. The initial purchase of a satellite receiver, related equipment, and installation generally totals between $2,000.00 and $4,000.00, although a low-cost satellite dish standing alone can cost as little as $199.00.

The EchoStar Revolving Charge Plan is set up much as any other credit card account. A consumer may make purchases using the card up to the credit limit set for the account. Paying part or all of the outstanding balance on the account replenishes the available credit to the extent of the payment. Bank One periodically imposes a finance charge on outstanding balances. Consumers receive monthly statements listing the outstanding balance, the minimum payment due on that balance, and the amount of remaining available credit. When enrolling in the Plan, consumers are supposed to receive all disclosures required by TILA for open-end credit plans, although the plaintiffs state that they did not receive such disclosures when they signed up for the EchoStar plan.

The central issue in all of the pending motions for summary judgment is whether,

facts in support of their motions, and from their responses to their opponents' submissions. Some of the responses to factual submissions failed to comply with Local General Rules 12(M) and (N); a prime example of this is the declaration that "the factual assertion is not material (or is vague), and therefore the party makes no response to it." Rule 12 does not permit a party responding to factual submissions to pick and choose among the submissions and only deign to respond to those judged "material" or "relevant." Rather, it is the *Court's* role to weed out irrelevant or immaterial factual submissions. The respondent's role is to respond to the assertion, citing to the record if the assertion is denied. Responses that do not conform to Rule 12's requirements are treated as admissions of the factual matter asserted. *See* Local Rule 12(M) and 12(N)(3)(b) (facts set forth in either party's statement are deemed admitted unless properly controverted); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994) (same).

in deciding to structure the EchoStar plan as a credit card plan, Bank One reasonably expected that consumers would continue to make purchases using the EchoStar card over time. Many of the parties' factual submissions relate to this issue. Fairly summarized, the submissions show that Bank One viewed repeat sales as a goal of the Plan, and genuinely believed that the credit card would encourage repeat sales to a relatively captive consumer base. Bank One planned to encourage such sales through advertising enclosed with the monthly account statements, as well as through other promotions.

Before entering into the agreement with Echo to create the Plan, Bank One reviewed sales data from a similar private label credit card plan that another company, Household Retail Services, had operated in conjunction with Echo. In 1993, there were 30,420 first-time purchases made under the Household plan, and 4,260 repeat purchases through the plan. Thus, 12.3% of all purchases made using the Household plan in 1993 were repeat purchases. The plaintiffs point out that these repeat sales only amounted to 2.3% of the income from purchases under the plan. For the first five months of 1994, repeat purchases were 17% of all Household plan purchases; these repeat purchases accounted for 3.8% of the dollar amount produced by sales under the plan. The above figures do not reflect accounts opened under the plan that were never used for any purchases.

After the inception of the Bank One/Echo-Star Revolving Charge Account plan in November 1994, Bank One included advertisements for Echo products and programming packages in its monthly statements to consumers. In its instructions to Echo dealers, Bank One also encouraged the dealers to promote the availability of the credit card for future purchases. Whether as a result of these promotions or for some other reason, consumers have made some additional purchases using their EchoStar credit cards. In April, 1995, repeat sales were 6.97% of all sales under the Plan. One year later, repeat sales accounted for 11.40% of the sales under the Plan. (In June and July of 1996 repeat sales accounted for half of all Plan sales, but the plaintiffs argue that these months are not representative.) By August, 1996, 51,476 accounts had been opened under the Plan. Just under 60% of the accounts had been used to finance a purchase; a little over 40% had never been used. Of the 30,673 accounts that had been used for at least one purchase, 6,356 had also been used for an additional purchase. Thus, 12.3% of all accounts (active and inactive), or 20.7% of the active accounts, had been used for repeat purchases. A random sample of 75 repeat purchases made between March 1995 and May 1996 shows that 29% of the repeat purchases were for programming packages. Repairs or parts accounted for almost one quarter of the "add-on" sales. Another 25% was for satellite-related equipment such as additional receivers, remote controls, or surge protectors. The remaining purchases were stereo or sound equipment, televisions, VCRs, extended warranties, and programming guides.

## LEGAL STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). In making its decision, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Id.*

Where, as here, cross-motions for summary judgment have been submitted, the court is not obliged to grant judgment as a matter of law for one side or the other.

*Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving all factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

## ANALYSIS

### Count I–TILA Claim

■ TILA sets out two different types of credit that may be extended to consumers: open-end credit (the prototypical example is a credit card account), and closed-end credit, such as a car loan or other retail installment contract. Those who extend credit to consumers are responsible under TILA for knowing the difference between the two and making the appropriate mandatory disclosures to consumers. The regulation applicable to TILA (known as Regulation Z) requires that closed-end disclosures be made unless the credit at issue qualifies as an open-end plan. *See* Regulation Z, 12 C.F.R. § 226.5–17. Among other things, closed-end disclosures must include the total amount financed, including both the sale price and the total amount of interest that will be paid, the length of time over which payments may be made, the amount of each installment payment and the intervals between payments, and the amount of any finance charges. These disclosures must be made at the point of sale.

The disclosures required for open-end accounts are somewhat less onerous. They may be contained in a pre-printed form given to consumers before the account is opened, telling them (among other things) the annual percentage rate of interest charged on the account, and the nature and amount of any finance charges. Creditors have considerable incentive to structure credit in an open-end form if they can, both because the disclosures are less burdensome to provide, and because "they fear that certain closed-end credit disclosures, such as the total dollar amount of finance charge, the total of payments, and 'total sale price' might engender consumer resistance to the sale." Sheldon

Feldman, "The Specious Open–End Credit Plan—A Discussion of the Law Leading up to *FTC v. Traditional Industries,*" 45 Bus. Law. 1989, 1991 (June 1990). However, creditors may only treat a credit plan as open-end if it qualifies as such under TILA regulations. The plaintiffs contend that TILA required that the EchoStar Plan be structured as a closed-end credit plan, and that Bank One and Echo violated TILA by failing to provide them with closed-end disclosures.

The regulations define "open-end credit" as having the following three characteristics:

(i) The creditor reasonably contemplates repeated transactions;

(ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

(iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

12 C.F.R. § 226.2(a)(20). Closed-end credit is defined as any consumer credit other than open-end credit. *Id.,* § 226.2(a)(10). The parties agree that the EchoStar Plan had the latter two characteristics of open-end credit. The dispute is over the first requirement— whether Bank One and Echo "reasonably contemplated" that consumers would make repeated purchases under the Plan.

The only guidance to the intended meaning of "reasonably contemplate" is contained in the Official Staff Commentary to Regulation Z, located at 12 C.F.R. Part 226, Supplement I:

... [R]easonably contemplate repeated transactions ... means that the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension. The creditor must expect repeated dealings with the consumer under the credit plan as a whole, and need not believe the consumer will reuse a particular feature of the plan. A standard based on reasonable belief by a creditor necessarily includes some margin

for judgmental error. The fact that a particular consumer does not return for further credit extensions does not prevent a plan from having been properly characterized as open-end.

*Id.,* § 2(a)(20).3. The Commentary goes on to provide the following examples: (1) a thrift institution chartered for the benefit of its members could more reasonably expect repeat credit extensions than a seller of aluminum siding; and (2) a bank could reasonably make a loan for a consumer to purchase a car under a line of credit, whereas a car dealer could not reasonably sell a car under an open-end plan (because it is much less likely that the car dealer will have frequent regular repeat business from the same car buyer). *Id.*

■ Although the Commentary uses big-ticket items such as a home improvement or a car as examples of appropriate subjects for closed-end credit, the overall focus of the regulations is clearly on the likelihood of repeated purchases, not on the amount financed. Aluminum siding, which often carries a "lifetime guarantee," is unlikely to be purchased again and again by the same consumer. Likewise, the average American often goes years between purchasing cars. It is not merely that these items are expensive, but that they usually involve a "one-time credit extension" that makes them appropriate for closed-end financing.

■ In considering whether repeated transactions are likely, we are to consider the nature of the creditor's business and the relationship between the creditor and the consumer. *Id.* Here, the relevant "business" is that of the Echo-approved retailers, which provide the only places that an EchoStar credit card may be used. These retailers sell a variety of consumer electronics; although the product line that is most important for the Plan's purposes is satellite-related products and programming, the retailers generally sell other popular audiovideo equipment including televisions, VCRs, and stereo equipment. Echo and its dealers also sell satellite television programming, another

product that must be bought or renewed at regular intervals. Because these dealers carry a wide array of products that are appealing to consumers, as well as television programming that regularly expires and must be renewed, we find that the nature of the business supports the hypothesis that repeat sales are likely. The relationship between the creditor/retailers and the consumer also makes repeat sales likely: although it is certainly possible that a consumer who buys something at an Echo-approved dealer will never enter those doors again, it is not unreasonable to suppose that a consumer visits a particular retailer because it is conveniently located, has good products or prices, or for some other reason that would remain equally valid over time. The number and accessibility of Echo-approved dealers—over 750 dealers across the country—also affects the likelihood of future purchases under the Plan, since consumers who relocate may still be able to use the Plan credit card to make purchases.

The Household Retail sales data also support Bank One's judgment that repeat credit sales were sufficiently likely to warrant adopting an open-end plan. The data showed repeat sales of between 12 and 17 percent of total sales.[2] While these figures are not overwhelming evidence that repeat sales were likely under Bank One's similar Plan, they do not make it unreasonable as a matter of law to structure the Plan as open-end rather than closed-end credit. This conclusion is buttressed by Regulation Z's requirement that creditors be given some leeway for judgmental error in predicting the likelihood of repeated transactions.

Finally, although this factor standing alone would not be persuasive, Bank One was not unreasonable in taking its own plans to aggressively encourage repeat purchases into account in deciding whether repeat sales were likely. Bank One set up marketing plans, including the use of inserts in its monthly statements to EchoStar credit card holders, that appear to have been genuinely calculated to produce future purchases. The

---

**2.** It is true that these repeat sales accounted for less than 5% of the total revenue from sales under the Household plan. However, there is no requirement in TILA or Regulation Z that the repeat sales amount to a certain threshold percentage of the creditor's/retailer's income.

results since the EchoStar Plan was initiated demonstrate that repeat sales in fact occur: over 20% of the Plan's active accounts have been used for repeat purchases.

The plaintiffs do not argue with these facts, although they do dispute the weight to be assigned them. The plaintiffs' central contention is that the Plan is falsely set up as an open-end plan when it should really be a closed-end plan because it involves the purchase of big-ticket goods.[3] Indeed, the instructions to retailers require that a satellite television system—an item that typically costs between $2,000.00 and $4,000.00—be among the first purchases made upon opening an EchoStar credit account. The plaintiffs are correct in suggesting that frequent repeat sales of satellite television systems themselves are unlikely, as consumers are not likely to want more than one of these. And, in many ways the use of a credit card to purchase items costing several thousand dollars undermines the goals of TILA because it makes it easier for consumers to finance large purchases on credit without truly realizing the costs associated with that credit.

Nevertheless, it is clear that under the law as it is presently written, the legitimate expectation of repeat sales, and not the probability that consumers may plunge deeply into debt without realizing the finance charges they will pay, is the test for whether credit should be considered open-end or closed-end. Although the requirement that the EchoStar credit card must be first used to make a large, one-time purchase is an unusual feature for a credit card account, we cannot see that it removes the account from the category of open-end credit plans or otherwise violates TILA.

· In holding that the defendants are entitled to summary judgment on the TILA claim, we are aware of the language in the Official Staff Commentary to Regulation Z stating that the determination of whether a creditor "reasonably contemplated" repeated transactions is a question of fact. 12 C.F.R. Pt. 226, Supp. I, § 2(a)(20).3. Here, however, none of the relevant facts are disputed; rather, the parties dispute the correct interpretation of those facts under the law of TILA. The task of interpretation is, of course, a question of law that is within the province of the court. The court is likewise aware of other case law denying defendants' motions for summary judgment on similar claims, some of which contain excellent analyses of the law in this area. *See, e.g., Perry v. Household Retail Services, Inc.,* 953 F.Supp. 1370 (M.D.Ala. 1996); *Maes v. Motivation for Tomorrow, Inc.,* 356 F.Supp. 47 (N.D.Cal.1973). Those cases are distinguishable, however, as the evidentiary records there were far less developed than in the present case. It is that evidentiary record, which is almost entirely undisputed, that leads to our decision that a reasonable trier of fact could not conclude that the defendants committed a TILA violation. We therefore grant summary judgment in the defendants' favor on the plaintiffs' TILA claim.

### Count II–ICFA

The entry of summary judgment on Count I mandates that Count II suffer a similar fate, as the plaintiffs' claim in Count II rests on the TILA violation alleged in Count I. *See* Pls.' Mot. for Partial Summ. Jmt. at 7 ("The same conduct that constitutes a violation of TILA also violates the Illinois Retail Installment Sales Act ... [and as] a result, Bank One was precluded from collecting any finance, delinquency, collection or refinance charges"; its attempt to collect such charges from the plaintiffs constitutes the alleged ICFA violation).

### CONCLUSION

For the foregoing reasons, the motions of defendants Bank One and Echo [71–1] and Superior [77–1] for summary judgment in their favor is granted, and the plaintiffs' motion for partial summary judgment [66–1] is denied. The clerk is directed to enter judgment in favor of the defendants and against the plaintiffs.

---

**3.** Ben Manley, the head of the private label credit division at Bank One, described satellite television sion systems as "big-ticket" items in his deposition. Manley dep. at 88.