144 F.3d 1056
 Harry BENION and Patricia Benion, on behalf of themselves
and all others similarly situated, Plaintiffs-Appellants,
v.
BANK ONE, DAYTON, N.A., Echo Acceptance Corporation, and
Superior Satellite, Inc., Defendants-Appellees.
 No. 97-2769.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 13, 1998.
Decided May 21, 1998.
 
 O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, Daniel A. Edelman, Cathleen M. Combs, Rick D. Young (argued), Edelman & Combs, Chicago, IL, James E. Arend, Gessler, Hughes & Socol, Chicago, IL, for Plaintiffs-Appellants.
 Craig A. Varga (argued), Varga, Berger, Ledsky & Hayes, Chicago, IL, Ira Rubin, Pauker & Rubin, Chicago, IL, for Defendants-Appellees.
 Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This appeal presents an important interpretive question under the Truth in Lending Act and one on which we are unable to find any appellate decisions. Mr. and Mrs. Benion bought a satellite dish from Superior Satellite, an authorized dealer in products distributed by EchoStar Communications. The price of the dish was around $3,000 and in addition the Benions paid $1,000 for a year's worth of programming transmitted by satellite. The Benions didn't want to pay cash for these purchases, and so applied for an "EchoStar" credit card. This card is offered by Bank One in conjunction with Echo Acceptance (EchoStar's consumer financing arm). The Benions' application was accepted on the spot and they were given the card with a credit limit of $4,500, a few hundred dollars above the price of their purchases. The EchoStar card may be used at any of the hundreds of authorized retail dealers in EchoStar products. But EchoStar requires that the first use of the card include the purchase of a satellite dish, which usually costs at least $2,000, and limits subsequent purchases to goods and services that can be used in conjunction with the dish, such as a television set, video recorder, or television programming (a pay channel, for example). In the papers accompanying the sale to the Benions, the interest rate that Bank One charges on the unpaid balance of credit card debt--a variable rate that at the time of the sale and the issuance of the card to the Benions was about 19 percent--was disclosed, but not the total finance charge (roughly, the dollar amount of the interest) that the credit card holder would incur if the debt were paid off at the minimum rate permitted.
 
 
 2
 The Benions weren't happy with their purchase and refused to pay anything toward the satisfaction of their credit card debt, precipitating a legal squabble between them and Superior, Echo Acceptance, and Bank One. The squabble has mushroomed into a class action by the Benions on their own behalf and that of some 50,000 other users of the EchoStar card, claiming that the disclosures made to users concerning the cost of credit violate the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and the Illinois Consumer Fraud Act, 815 ILCS 505/ 1 et seq. The district judge granted summary judgment for the defendants on both claims. 967 F.Supp. 1031 (N.D.Ill.1997). He held that the state fraud claim was derivative from the Truth in Lending Act and fell with it. Id. at 1037. The plaintiffs do not challenge the derivative status of the fraud claim in their opening brief, and so we shall not have to consider that claim further.
 
 
 3
 The Truth in Lending Act has separate disclosure requirements for "open-end" and "closed-end" credit transactions. The requirements for the latter are more onerous (compare 15 U.S.C. § 1637 with id. § 1638), and include stating the total finance charge. Id., § 1638(a)(3); 12 C.F.R. § 226.18(d). If the credit arrangements with the Benions are classified as closed end, the Act was violated; otherwise not.
 
 
 4
 An open-end credit plan, the category that includes legitimate credit-card credit and revolving credit more broadly, is a financing plan under which the creditor "reasonably contemplates repeated transactions." 15 U.S.C. § 1602(i). The Federal Reserve Board, which has the statutory power to make regulations particularizing the obligations of creditors under the Act, 15 U.S.C. § 1604(a); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 559-60, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); Mourning v. Family Publications Service, Inc., 411 U.S. 356, 365-66, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); Gibson v. Bob Watson Chevrolet-Geo, Inc., 112 F.3d 283, 285 (7th Cir.1997); Consumers Union of the U.S., Inc. v. Federal Reserve Board, 938 F.2d 266, 269 (D.C.Cir.1991), has in its Regulation Z merely (so far as relevant here) repeated the statutory definition of open-end credit that we just quoted. 12 C.F.R. § 226.2(a)(20)(i). The Board's Official Staff Commentary on this section of Regulation Z, 12 C.F.R. pt. 226.2(a)(20)3, supp. I, which also has the status of a regulation, Ford Motor Credit Co. v. Milhollin, supra, 444 U.S. at 565-70, 100 S.Ct. 790; McGee v. Kerr-Hickman Chrysler Plymouth, Inc., 93 F.3d 380, 383 (7th Cir.1996); Cades v. H & R Block, Inc., 43 F.3d 869, 875 (4th Cir.1994), is more expansive, but adds little of substance to Regulation Z beyond a reminder that the criterion is what is reasonably contemplated rather than what actually occurs, so that the fact that a particular customer uses a credit card only once does not convert the credit plan from open end to closed end. "[T]he creditor must reasonably contemplate repeated transactions. This means that the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension.... The fact that a particular consumer does not return for further credit extensions does not prevent a plan from having been properly characterized as open-end." Nowhere does the statute, regulation, or staff commentary specify a minimum number of repeat purchases that must either be contemplated or occur.
 
 
 5
 It is beyond contestation that the bank (the only Truth in Lending defendant) hoped and expected, and reasonably expected, to have at least some repeat transactions with the holders of the EchoStar card. The card was usable at any dealer in a nationwide chain of dealers. Bank One had an aggressive marketing strategy designed to promote repeat purchases, which was very much in its financial self-interest. The bank had studied the performance of EchoStar's financing plan in an earlier incarnation and had obtained statistics which showed that repeat purchases had been an increasing fraction of total purchases under the plan. And, although we must not confuse hindsight with foresight, what actually happens is some evidence of what was reasonably expected to happen, and so it is relevant though not determinative to note that 20 percent of all holders of the EchoStar card issued by Bank One who used the card at least once (some never used it) made one or more additional purchases with the card after the initial purchase. The Benions bought only one year's worth of programming; it was likely that they would use the card to buy programming for the next year.
 
 
 6
 As neither the statute nor the regulation specifies a minimum level of "repeated transactions," it is apparent from the uncontradicted evidence just recited that the defendants have complied with the letter of the law. It is also apparent that a law which fixed a minimum level of repeat purchases for credit to qualify as open end would place the "private label" (as distinct from bank) credit card business in jeopardy unless it threw in the towel and made the disclosures required for closed-end credit. For the issuer could never be sure that consumer dissatisfaction, or a switch by consumers to an alternative method of financing, wouldn't cause repeat purchases to fall below the threshold fixed by the law. The jeopardy would be particularly great for new cards. Not only couldn't consumer acceptance be assured; the level of repeat purchases would necessarily be slight at the outset, since a repeat purchase cannot be made before the first purchase. In fact the percentage of purchases with the EchoStar card that are repeat purchases has grown since the card was introduced.
 
 
 7
 The Benions complain that their credit limit was so low in relation to their initial purchase ($4,500 versus $4,300) that the defendants could not have reasonably contemplated repeat purchases by them. But since it was a revolving credit limit, they could make substantial repeat purchases as soon as they paid off a substantial portion of the debt that they had incurred in making the initial purchase.
 
 
 8
 The Benions have a better argument--that the defendants were trying to evade the Truth in Lending Act by conditioning the first use of the card on the purchase of a big-ticket item and then limiting subsequent purchases to products related to the initial purchase. They invite us to consider the enormous loophole that would be created if auto dealers could finance the purchase of an automobile by issuing a credit card conditioned on the holder's using it to buy an automobile from the dealer (or, as here, other dealers in the same product), and could justify this as open-end credit by pointing out that purchasers of automobiles buy parts and service from either the same dealer or other dealers in the same make of automobile. But if such a method of financing big-ticket purchases would be an abuse of the open-end credit provision of the Truth in Lending Act, as we may assume it would be, it could be curbed only by changing the regulatory scheme, for example by specifying a minimum ratio of subsequent purchases to original purchase. When an activity of a technical and specialized character is comprehensively regulated by an expert agency, as consumer credit disclosures are comprehensively regulated by the Federal Reserve Board (and no one doubts that this particular agency is a repository of genuine expertise), courts should generally leave the plugging of loopholes to the agency, lest the court's reparative efforts create confusion and disrupt the regulatory scheme. Cf. Ford Motor Co. v. Milhollin, supra, 444 U.S. at 566-69, 100 S.Ct. 790; Wise v. El Paso Natural Gas Co., 986 F.2d 929, 935 (5th Cir.1993); Butler County Memorial Hospital v. Heckler, 780 F.2d 352, 355-56 (3d Cir.1985).
 
 
 9
 As a matter of fact, shortly before the argument of the appeal in this case, the Board invited public comment on a proposed amendment to the Official Staff Commentary that would have forbidden the use of open-end credit in the present type of case. 62 Fed.Reg. 64,769, 64,772 (Dec. 9, 1997). But after receiving the public's comments, the Board, while expressing criticism of creditors' failing to disclose the finance charge in "the financing of used automobiles and the door-to-door credit sales of satellite dishes, water treatment systems, and home improvement contracts," withdrew the proposal, having determined that it would be infeasible to formulate a clear rule that would differentiate between legitimate and illegitimate open-end credit programs. 63 Fed.Reg. 16,669, 16,670 (Apr. 6, 1998). (The present case involves the sale of satellite dishes, but not their "door-to-door" sale.)
 
 
 10
 If the Board cannot formulate such a rule in the exercise of its expert administrative discretion, we surely cannot formulate it as a matter of statutory interpretation. Yet in the teeth of the language of the statute as well as in defiance of practicality, the plaintiffs argue that the Truth in Lending Act already contains a minimum ratio of repeat to original purchases--and it is 1:1. That is, repeat purchases must be at least half the total purchases made with the credit card for the financing plan to be open end. The plaintiffs base this argument on the Senate report which accompanied the amendment to the Truth in Lending Act in 1980 that first required that the creditor have reasonably contemplated repeat sales. The report discusses "spurious open end credit," which occurs when "a merchant styles what is likely to be a one-time credit extension in the form of a purchase on an open end (revolving charge) plan;" it adds that closed-end disclosures (in particular the finance charge) should be required "where an initial transaction is the purchase of infrequently purchased items such as a home improvement or automobile." S.Rep. No. 73, 96th Cong., 2d Sess. 10-11 (1980). The Benions argue that "likely" means more than 50 percent probable, that a probability of more than 50 percent is equivalent to a frequency of more than 50 percent, and hence that the issuer of a private label credit card violates the Act unless more than 50 percent of the purchases made with the card are repeat purchases--and anyway that big-ticket items are not eligible for credit card credit.
 
 
 11
 What a series of leaps! The biggest is substituting a statement in a committee report for the language of the statute, and of the regulation and commentary of the agency that Congress entrusted with particularizing the statute. Substituting legislative history for legislation has become a disfavored method of statutory interpretation, Shannon v. United States, 512 U.S. 573, 583-84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994); Baker v. GTE North Inc., 110 F.3d 28, 30-31 (7th Cir.1997); International Brotherhood of Electrical Workers v. NLRB, 814 F.2d 697, 708, 710-15 (D.C.Cir.1987), in recognition of the fact that Congress enacts and the President signs statutes rather than committee reports. In any event the committee report on which the Benions rely cannot be taken literally, because neither "likely" nor "infrequently purchased" is an operational criterion. The committee was obviously concerned with what it called spurious credit card financing, but the chosen method of dealing with it was by general language in a statute that delegates rulemaking authority to an agency. Had the committee proposed amending the statute to substitute the language of the committee report, there might well have been a fight on the floor of Congress because of the breadth and vagueness of that language.
 
 
 12
 The plaintiffs do not seek a trial (their lawyer made this clear at argument) at which to try to prove that it was unreasonable for the bank to expect repeat purchases. They want summary judgment. They think they've already proved their case by showing that satellite dishes are (or at least were at the time the Benions bought their dish, because the prices of the dishes have been falling rapidly since) "big ticket" items; that the issuance of the card was conditioned on its being used to buy the dish; that their credit limit was set just above the price of their initial purchase; that the most likely subsequent purchases with the card, such as television sets and programming, are generally less expensive and often much less expensive than the dish; and that creditors want to disclose as little information about credit costs as they can get away with doing. These points are of marginal relevance at best; at worst they could be thought to assume that repeat purchases were expected and to be quibbling merely over the amount of those purchases, which is consistent with the Benions' claim that 50 percent of the total purchases must be repeat purchases but with nothing else. Since EchoStar's principal product is satellite dishes, it is natural that it should want to condition the extension of credit on the purchase of a dish. This is consistent with a reasonable expectation that the holder of the card will use it to buy other things as well--the goods and services that are complements to the dish in the economic sense and so enhance its value. All the facts alleged by the plaintiffs are consistent with an expectation of repeat purchases.
 
 
 13
 There may be cases in which the issuer of the card does not reasonably contemplate any repeat purchases; an example would be a sale of aluminum siding by a company that sells nothing else. The statute and regulation take care of that case, which in fact is specifically mentioned in the staff commentary. 12 C.F.R. pt. 226.2(a)(20)3, supp. I. They do not address the case in which the issuer reasonably contemplates repeat purchases though fewer than it would if it were financing sales by a department store or other general retail dealer.
 
 
 14
 AFFIRMED.