Brenda A. MYERS and Clausezill Myers, etc., Plaintiffs,

v.

FIRST TENNESSEE BANK, N.A. Defendant.

No. CIV. A. 96–A–783–N.

United States District Court, M.D. Alabama, Northern Division.

March 21, 2001.

William U. Norwood, Pope, McGlamry, Kilpatrick & Morrison, Atlanta, GA, C. Neal Pope, Pope, McGlamry, Kilpatrick & Morrison, Columbus, GA, C. Knox McLaney, III, McLaney & Associates, Montgomery, AL, Lynn W. Jinks, III, Jinks, Daniel, Crow & Seaborn, LLC, Union Springs, AL, Angela L. Kimbrough, Law Offices of Angela L. Kimbrough, Eutaw, AL, for Plaintiffs.

Gregory Carl Cook, Michael L. Edwards, Lisa Johnson Sharp, Leigh Anne Hodge, Balch & Bingham, Birmingham, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

## I. INTRODUCTION

This cause is before the court on a Motion to Dismiss Counts II and III of the Complaint filed by Defendant First Tennessee Bank National Association ("First Tennessee") on June 27, 2000; a Motion for Leave to Amend the Complaint to dismiss Counts II and III filed by the Plaintiffs Brenda A. Myers and Clausezill Myers ("Plaintiffs") on March 9, 2001; and a Motion for Summary Judgment filed by First Tennessee on January 31, 2001.

The Plaintiffs, Brenda Myers and Clausezill Myers, originally filed their Complaint in this case in May of 1996, bringing claims on their behalf and on behalf of all others similarly situated. The Plaintiffs claim that Home Cable Concepts of Tennessee, Inc. ("Home Cable") and First Tennessee Bank, N.A. ("First Tennessee") violated the Truth in Lending Act ("TILA") (Count I), violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count II), and engaged in fraud by suppression (Count III). This court granted a Motion to Dismiss Home Cable from the case without prejudice on February 14, 2000.

Accepting a recommendation by the Magistrate Judge in this case, the court denied in part and granted in part the Plaintiffs' Motion for Class Certification, certifying a TILA liability and statutory damages class.

The Plaintiffs have sought to amend the Complaint "dismissing Count II—RICO and Count III—Fraud by Suppression in Alabama." Plaintiffs' Motion for Leave to Amend the Complaint. The Plaintiffs, therefore, apparently concede that Counts II and III are due to be dismissed. The Motion to Dismiss Counts II and III is, therefore, due to be GRANTED and the Motion to Amend is due to be DENIED as moot. Consequently, the Motion for Summary Judgment is due to be DENIED as moot as to Counts II and III.

For reasons to be discussed, the Motion for Summary Judgment is due to be DENIED as to Count I.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "

*Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

The submissions of the parties, viewed in a light most favorable to the non-movant, reveal the following facts:

Brenda and Clausezill Myers purchased a satellite dish from Home Cable which was financed by First Tennessee. The sale was solicited by a door-to-door salesman named Jim Campbell who, according to the Plaintiffs, represented that the satellite dish would be paid off in two years at a monthly payment of $59.95. The Plaintiffs were issued a private label credit card. The disclosures given to the Plaintiffs complied with open end financing disclosure requirements under TILA, but not closed end disclosure requirements. The Plaintiffs state that when Brenda Myers received her second bill, she realized that the financing was not as she expected. Brenda Myers states in her deposition that she complained to First Tennessee and that representatives of Home Cable asked her to sign a release of liability, and when she did not, they took her receiver. First Tennessee subsequently credited the full amount charged to the Myers' account and refunded their only payment.

First Tennessee is a national banking association. Home Cable was engaged in the retail sales of satellite television equipment. Home Cable transferred its financing of satellite purchases from Bank One to First Tennessee when the two entered into a Private Label Revolving Credit Plan Agreement. The agreement was not exclusive. Customers could also purchase the satellite systems by paying cash or using other credit cards. Hutchinson Affidavit ¶ 9. The private label revolving credit accounts generally were opened with a credit limit at least $200 higher than the amount of the initial transaction to allow the customer to have additional credit for the next year's programming or maintenance charges. *Id.*

Randall Hutchinson is a senior vice-president with First Tennessee. Hutchinson oversaw the development of the private label credit card with Home Cable. In his deposition, he states that the additional purchases contemplated by First Tennessee in giving open end credit disclosures in connection with the financing of the satellite dish were programming and service. Hutchinson Deposition, at page 40. The Plaintiffs contend that First Tennessee did not reasonably anticipate that these additional purchases would be made on the private label credit card.

## IV. *DISCUSSION*

Because, as stated above, the Motion for Summary Judgment as to Counts II and III is due to be DENIED as moot, the court will only address the Motion for Summary Judgment as it relates to Count I of the Complaint.

In Count I of the Complaint, the Plaintiffs bring a TILA claim. The Plaintiffs contend that First Tennessee violated TILA by characterizing the credit transac-

tion between First Tennessee and the Plaintiffs as an open end credit transaction and providing the disclosures which are required for an open end transaction, when First Tennessee should have provided closed end disclosures.

■ An open end credit transaction is one in which the creditor reasonably contemplates repeated transactions. 15 U.S.C. § 1602(i). Under the defining regulation, Regulation Z, open end credit means credit extended under a plan in which:

(i) The creditor reasonably contemplates repeated transactions;

(ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

(iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

■ The Official Staff Commentary to this regulation gives further guidance, specifically with regard to the repeated transaction element. The Official Staff Commentary states that "the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension." 12 C.F.R. Pt. 226.2(a)(20)–3. Also, the fact that particular consumers do not return for further credit extensions does not prevent a plan from having been properly characterized as open end. *Id.* The Official Staff Commentary further states that the criterion regarding repeated transactions is a question of fact to be decided in the context of the creditor's type of business and the creditor's relationship with its customers. *Id.*

The Plaintiffs in this case also point out that there was a proposed amendment to the Official Staff Commentary which was never adopted. Under the proposed commentary, there were five factors to consider including whether the credit line is limited to the purchase of items not likely to be purchased in multiples, whether the credit was established to purchase a designated item, and the amount of the purchase compared to the credit line, the extent to which a creditor reasonably solicits customers with its line of credit to make additional purchases under the credit line, whether the creditor has information on consumers with the credit line showing that consumers have made repeat purchases. *See* 62 Fed.Reg. 64,769, 64,772 (Dec. 7, 1997). An example given of when a creditor was not likely to reasonably assume repeated transactions was where there was a $5,000 credit line to purchase a $4,500 satellite dish. *Id.* After receiving public comment on the proposed amendment, the Federal Reserve Board expressed criticism of creditors' failing to disclose the finance charge in the "financing of used automobiles and the door-to-door credit sales of satellite dishes, water treatment systems, and home improvement contracts," but withdrew its proposal, stating that it would be infeasible to formulate a clear rule to differentiate between legitimate and illegitimate open end credit programs. *See Benion v. Bank One, Dayton, N.A.,* 144 F.3d 1056, 1059 (7th Cir.1998) (citing 63 Fed.Reg. 16, 669, 16,670 (April 6, 1998)).

There are several cases decided by federal courts which have examined the reasonableness of a creditor's expectation of repeat transactions under facts similar to the facts in this case. One of these cases was decided by another judge in this district. *See Perry v. Household Retail Services,* 953 F.Supp. 1370 (M.D.Ala.1996), *summary judgment granted on other grounds upon reconsideration by, Canaday v. Household Retail Servs., Inc.,* 119 F.Supp.2d 1258 (M.D.Ala.2000)(De Ment,

J.). In *Perry*, the plaintiffs brought a TILA claim challenging the disclosures made with regard to the financing of a satellite dish purchase. The court concluded that a question of fact was raised as to reasonableness which was sufficient to defeat the defendant's motion for summary judgment. *Id.* at 1375.

The Seventh Circuit analyzed a case in which Bank One offered a private label credit card to plaintiffs who bought a satellite dish from an authorized dealer. *Benion*, 144 F.3d at 1057. The card had a credit limit a few hundred dollars above the purchase price of the satellite dish and could be used at any of hundreds of authorized retail dealers in the products. *Id.* The Seventh Circuit reasoned that although the card was issued to purchase a "big ticket" item, the most likely subsequent purchases would be of television sets and programming and would be much less expensive, and the credit limit was set just above the purchase prices of the initial purchase, these and other factors were of marginal relevance and "at worst they could be thought to assume that repeat purchases were expected and to be quibbling merely over the amount of those purchases." *Id.* at 1060. The court further rejected the argument that the proposed addition to the Official Staff Commentary was dispositive, stating that "[i]f the Board cannot formulate such a rule in the exercise of its expert administrative discretion, we surely cannot formulate it as a matter of statutory interpretation." *Id.* at 1059. The case was before the court on cross motions for summary judgment, and the Seventh Circuit affirmed a grant of summary judgment to the defendant. *Id.* at 1060.

The *Benion* decision was followed in a district court in the Seventh Circuit. *See Speakman v. Household Retail Services,* 1999 WL 515500, No. 97–C–1913 (N.D.Ill. July 14, 1999). In *Speakman,* two married couples who resided in Alabama alleged that the defendant violated TILA by not giving closed end disclosures when they purchased vinyl exterior siding for their homes. *Id.* at *1. The card issued to the plaintiffs could be used at any of the defendant's retail dealers. *Id.* at *3. The court granted summary judgment in favor of the defendant on the reasonableness issue. *Id.* at *5.

In *Long v. Fidelity Water Systems,* 2000 WL 760328, No. C–97–20118 RMW (N.D.Cal. March 16, 2000), the plaintiffs alleged that the defendant sold water purification systems to homeowners using door-to-door practices which were deceptive because they failed to include the proper TILA disclosures. The court examined the evidence before it, stating that repeat transactions account for 2–3% of the total dollar volume of transactions on the accounts and approximately 1% of the accounts generate a repeat transaction in any month. The court framed the issue before it as whether no rational jury could conclude that it was unreasonable for the defendants to contemplate repeat transactions based on that data. *Id.* at *2. The court also examined the proposed Official Staff Commentary, which specifically refers to the door-to-door sale of water treatment systems as a transaction which concerned the Federal Reserve Board when the total finance charge is not disclosed. *Id.* at *3. The court, relying on *Benion,* determined that no bright line rule distinguishing legitimate open end credit plans from plans which are actually closed end credit plans designed to evade TILA disclosure requirements, can be created as a matter of statutory interpretation based on the number or dollar volume of repeat transactions. *Id.* at *4. Relying in part on the *Perry* decision from this district, the court concluded that summary judgment could not be granted on the reasonableness issue. *Id.*

First Tennessee relies heavily on the *Benion* and *Speakman* decisions, but does not address the *Long* decision. First Tennessee has argued that it received information from Home Cable that during its arrangement with Bank One, Home Cable had customers who renewed programming with it at a rate of 50% and that the percentage of its customers who financed the additional purchases on the private label credit card was 35%. First Tennessee states, therefore, that there is uncontested evidence that it anticipated repeat customers. Of course, while it may be uncontested that First Tennessee anticipated repeated use of the private label credit card, the inquiry before this court is whether that anticipation was reasonable. Although First Tennessee argues that because the programming obtained at the time of the original purchase would only last one year, it was reasonable to believe that customers would make repeat purchases on the card, that does not necessarily mean that it would be reasonable to conclude that additional programming would be purchased on the First Tennessee revolving credit card.

██ Under the Official Staff Commentary on TILA regulations, "the criterion regarding repeated transactions is a question of fact to be decided in the context of the creditor's type of business and the creditor's relationship with its customers." 12 C.F.R. Pt. 226.2(a)(20)–3. Questions of fact are generally inappropriate issues for summary disposition. Significantly, the issue in applying the first criterion is an objective reasonableness inquiry, which is generally treated as an issue appropriately resolved by the trier of fact. *See Long*, 2000 WL 760328 at *2 (quoting *TSC Indu. v. Northway, Inc.*, 426 U.S. 438, 450 n. 12, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see*

*also Trucks, Inc. v. United States*, 234 F.3d 1340, 1343 (11th Cir.2000)("questions of reasonableness and state of mind are questions for the jury and should not be decided on summary judgment . . . ."); Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 10A *Fed. Prac. & Proc. Civ.*3d § 2729 (stating in the context of summary judgment motions on negligence claims that "even when there is no dispute as to the facts, it usually is for the jury to decide whether the conduct in question meets the reasonable-person standard."). The authority for departing from this general rule and making the reasonableness determination as a matter of law is *Speakman*, and to a lesser extent *Benion*.[1] This court will first determine, therefore, whether this case is sufficiently similar to *Speakman* and *Benion* to cause this court to conclude that it must decide the reasonableness issue in First Tennessee's favor as a matter of law.

While First Tennessee contends that the facts of this case are indistinguishable from *Benion* and *Speakman* in any material respect, there are facts in this case which are relevant to a determination of reasonableness which distinguish this case from *Benion* and *Speakman*. For instance, in both *Benion* and *Speakman*, there were retail stores at which the plaintiffs could make additional purchases on the private label credit cards. *Benion*, 144 F.3d at 1057; *Speakman*, 1999 WL 515500 at *3. In fact, the *Benion* court made a point of stating, after citing to the proposed amendment to the Official Staff Commentary cited above, that its case involved the sale of satellite dishes, but not their door-to-door sale. *Benion*, 144 F.3d at 1059. While First Tennessee states that Home Cable had operations in other

---

1. Benion was decided on cross-motions for summary judgment and the plaintiff informed the appellate court that it did not wish to submit the issue to a jury. *Benion*, 144 F.3d at 1060.

states, there is no evidence to establish that there were retail stores at which additional programming, or other purchases, could be made. Hutchinson testified in his deposition that Home Cable is the only merchant he is aware of that had done door-to-door sales. Hutchinson Deposition, page 7. Kelly Morrell, the Metro Sales Manager for Middle Tennessee for First Tennessee stated in her deposition that she knew that Home Cable sold satellite dishes door-to-door and did not have a store front or retail business. Morrell Deposition, pages 43–44.

Also, the *Speakman* court placed great significance on the fact that the defendants adequately evaluated the likelihood of repeat purchases by looking not only at the past add-on rate of the particular company, but also by looking at other repeat purchase rates at seven other businesses. *Speakman*, 1999 WL 515500 at *4. In this case, the evidence before the court is that First Tennessee only obtained information from Home Cable and did not obtain any information as to past repeat sales from Bank One, which had formerly offered credit for Home Cable purchases, or apparently from other companies engaged in similar credit plans. First Tennessee argues that Bank One would not have shared the information with a competitor. While that may be a factor to be considered in the reasonableness inquiry, the depth of investigative efforts is still a factual difference between this case and *Speakman.*

In addition, the *Benion* court also placed significance on efforts by the lender to promote repeat purchases through advertising. *See Benion,* 144 F.3d at 1058. The *Benion* court described the advertising efforts in that case as "an aggressive marketing strategy designed to promote repeat purchases." *Id.* at 1058. While not finding such an aggressive strategy in its case, the *Speakman* court noted that advertising was conducted by the retailer.

*Speakman,* 1999 WL 515500 at *4. While First Tennessee says that it pursued an aggressive marketing strategy, it points only to evidence of the terms of its agreement with Home Cable. This court has been pointed to no evidence of advertising in this case, and the Plaintiffs in fact assert that no such advertising was included in monthly statements by First Tennessee. Plaintiffs' Brief in Opposition, page 9.

Considering all of the circumstances of the financing arrangement in this case in the light most favorable to the non-movant, while there are factual similarities between this case and *Speakman* and *Benion,* the court must conclude that the circumstances of this case make it distinguishable from those cases, so that reasonableness cannot be determined as a matter of law.

While there are also factual differences between this case and the *Long* decision, in both *Long* and this case the initial purchase was made from a door-to-door salesperson. Moreover, this court finds the analysis in *Long* persuasive. TILA and its interpretive regulations are ambiguous as to the amount of repeat transactions which are required before it becomes reasonable for a creditor to expect repeat transactions. The court agrees with the *Long* court that the fact, recognized in *Benion,* that the federal reserve board does not feel it appropriate to establish a bright line to distinguish legitimate open end and close end credit plans also means that a court also cannot formulate such a bright line rule. *Long,* 2000 WL 760328 at *4. The *Benion* court did not have to decide the issue of whether the absence of a bright line rule should have precluded the district court from granting summary judgment in its case, because the plaintiff in that case did not want to present the issue to a jury. *Benion,* 144 F.3d at 1060. While the *Speakman* court granted sum-

mary judgment, this court does not agree with the *Speakman* court that because the court cannot conclude that the defendants acted unreasonably, summary judgment is due to be granted the defendants. *Speakman*, 1999 WL 515500 at *4. Instead, this court agrees with the *Long* and *Perry* courts that where, as here, the evidence could support either a finding of reasonableness or unreasonableness, summary judgment is due to be denied. *Perry*, 953 F.Supp. at 1374; *Long*, 2000 WL 760328 at *3. Accordingly, the court concludes that the circumstances of the credit card plan at issue in this case, which are distinct from the facts in *Benion* and *Speakman* in significant ways, raise a genuine issue of material fact as to reasonableness which precludes summary judgment in this case.

## V. *CONCLUSION*

For the reasons discussed, it is hereby ORDERED as follows:

1. The Motion to Dismiss Counts II and III of the Complaint (Doc. # 77) is GRANTED and Counts II and III are DISMISSED.

2. The Motion for Leave to Amend Complaint (Doc. # ) is DENIED as moot.

3. The Motion for Summary Judgment is DENIED as moot as to Counts II and III of the Complaint, and is DENIED as to Count I of the Complaint. The case will proceed on the Brenda and Clausezill Myers' statutory and actual damages claims under TILA and on the class members' statutory damages under TILA.

4. The parties are DIRECTED to prepare and provide to this court on or before **April 2, 2001** a copy of the proposed Notice of Class Certification to be served upon the members of the certified class, together with their plan for service.